PAUL RITTENHOUSE, JR., Plaintiff-Appellee, v. TABOR GRAIN COMPANY, Defendant and Third-Party Plaintiff-Appellant and Cross-Defendant-Appellant (Long Point Grain and Supply Company, Inc., Third-Party Defendant-Appellee and Cross-Plaintiff-Appellee; CE-Natco *et al.*, Third-Party Defendants-Appellees).

Fourth District No. 4—86—0486

Opinion filed September 20, 1990.

William R. Brandt and Peter W. Brandt, both of Livingston, Barger, Brandt & Schroeder, of Bloomington, for appellant.

Herbolsheimer, Lannon, Henson, Duncan & Reagan, P.C., of La Salle (R.J. Lannon, Jr., and Robert M. Hansen, of counsel), for appellee Greenlee Construction Co.

John A. Taylor, of Johnson & Taylor, and Randolph Spires, of Satter, Ewing & Beyer, both of Pontiac, for appellee Paul Rittenhouse, Jr.

Wildman, Harrold, Allen & Dixon, of Chicago (James P. Dorr, Dale G. Wills, and Timothy W. Heath, of counsel), for appellee CE-Natco.

Thompson, Strong, Blakeman & Schrock, Ltd., of Pontiac, and Dunn, Goebel, Ulbrich, Morel & Hundman, of Bloomington (Kenneth L. Strong, C. Thomas Blakeman, and John L. Morel, of counsel), for appellee Long Point Grain & Supply Company, Inc.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

This property damage action arose from the collapse of a bin at a grain storage facility in Long Point, Illinois. At trial, the circuit court erroneously directed verdicts thereby tainting the subsequent jury verdicts in the action. We affirm in part, reverse in part, and remand for further proceedings.

Following the collapse of a grain bin onto his property, Paul Rittenhouse, Jr. (Rittenhouse), filed a damage action against Tabor Grain Company (Tabor) and Long Point Grain and Supply Company, Inc. (Long Point), the respective operator and owner of the storage facility, under the recovery theories of negligence, *res ipsa loquitur*, and wilful and wanton misconduct. In response, though Rittenhouse would later dismiss the action against it, Long Point filed a cross-complaint against Tabor under the recovery theories of breach of lease, negli-

gence, and wilful and wanton misconduct. Long Point also filed a counterclaim against Tabor for contribution and indemnification. In turn, Tabor filed a counterclaim against Long Point under the recovery theories of breach of lease warranties, negligence, and wilful and wanton misconduct. Tabor also filed a separate claim against Long Point for contribution and indemnification. Tabor last filed third-party complaints against Jones Construction Company (Jones), Greenlee Construction Company (Greenlee Construction), and CE-Natco (Natco), the respective contractors and manufacturer of the grain bin and its foundation, for contribution and indemnification. The circuit court ultimately disposed of the third-party complaints under the construction statute of repose (Ill. Rev. Stat. 1983, ch. 110, par. 13–214(b)).

During the presentation of evidence at trial, the circuit court directed the following verdicts: (1) a verdict for Rittenhouse against Tabor on negligence and on compensatory damages; (2) a verdict for Tabor against Rittenhouse on *res ipsa loquitur*; and (3) a verdict for Long Point against Tabor on indemnification and on negligence. The circuit court allowed the jury to consider the remaining issues in the action. At the end of the presentation of evidence at trial, the jury returned the following verdicts: (1) a verdict for Rittenhouse against Tabor on compensatory damages in the sum of $62,186 and on punitive damages in the sum of $65,500; (2) a verdict for Long Point against Tabor on compensatory damages in the sum of $175,000, on rent in the sum of $14,240, and on punitive damages in the sum of $100,000; and (3) a verdict for Long Point against Tabor on the contribution counterclaim of the latter.

The following evidence was presented at trial.

Dean Ruff (Dean), the president of Long Point, testified his company purchased two used grain bins from Jones in 1966. At the time of purchase, the two grain bins stood erected on a site in Salina, Kansas. Long Point had the grain bins disassembled for transport to its storage facility. In preparation for the reerection of the two grain bins, Long Point first had Greenlee Construction construct foundations for the bins at its storage facility. The two grain bins were reerected with the first bin ready for use in the fall of 1966 and the second bin ready for use in the spring of 1967.

The bins were constructed with steel plates bolted in the form of rings. The dimensions of each ring were 8 feet in height and 80 feet in diameter. As erected, the grain bins rose nine rings, or 72 feet, in the air.

In November 1971, the second grain bin collapsed. Following the

collapse of the second grain bin, Long Point had structural reinforcements added to the first grain bin. Long Point also instituted a practice of limiting grain storage in the bin to only the level of the seventh ring.

In September 1987, Long Point leased its grain storage facility to Tabor. During the lease negotiations, Dean testified representatives of Tabor, John Christ and Dixon Stephens, agreed to continue the practice of limiting grain storage in the bin to only the level of the seventh ring. He also testified Tabor did not request any additional reinforcement or repair of the grain bin. After its lease of the grain storage facility to Tabor, Dean testified he reiterated the importance of the grain storage limitation practice to Mark Jahraus, the manager of the facility for Tabor.

Dean next testified to the lease agreement with Tabor. The lease agreement included a schedule of assets for the grain storage facility. The schedule of assets listed the grain storage capacity of the facility. Although the amount of rent was to be based on the grain storage capacity of the facility, Long Point did not correct the schedule of assets to account for the grain storage limitation practice. Rather, Long Point entered into the lease with only an oral modification of the grain storage limitation practice as Tabor did not seem willing to amend the agreement.

Dean last testified to his inspection of the grain bin. In the inspection prior to the lease agreement, he did not find any settlement or structural safety problems with the grain bin. Dean last inspected the grain bin at the time of the collapse. He observed the bolts had sheared from the steel plates in the second ring of the grain bin. Dean only then learned Tabor had stored grain in excess of the seventh-ring limitation level.

Jerry Ruff (Jerry), the manager of the grain storage facility for Long Point, corroborated the testimony of Dean. He also testified to the structural safety inspection of the grain bin. Following the collapse of the second grain bin, Long Point contacted National Tank Company (National), the bin manufacturer, to conduct a safety inspection of the first grain bin. National found the bin structurally safe for the storage of grain without any limitation in storage practices. Long Point still had reservations as to the structural safety of the first grain bin following that inspection. As an added safety measure, Long Point thereafter instituted a practice of limiting grain storage in the bin to only the level of the seventh ring. The seventh-ring limitation level was not based on any formal structural engineering calculation.

Otis Ruff (Otis), a Long Point maintenance employee, then corrob-

orated the testimony of Dean and Jerry. Otis testified the representatives of Tabor had been informed of the grain storage limitation practice during the lease negotiations. Otis also testified he personally informed Jahraus of the grain storage limitation practice at the time of the transition in management.

Mark Jahraus, the manager of the facility for Tabor, testified to its grain storage practices. Tabor had exclusive control over operation and possession of the grain storage facility. Tabor instructed Jahraus to continue the existing facility practice of limiting the storage of grain in the bin to between the seventh and eighth rings. Long Point also instructed Jahraus to continue its grain storage limitation practice.

In early October 1982, Jahraus conducted the harvest season inspection of the grain bin. He did not find any structural safety problems with the grain bin. Jahraus then allowed storage of the current grain harvest in the bin. He later authorized the transfer of 6,400 bushels of grain from the bin to other storage. This transfer left 334,000 bushels of grain still stored in the bin. At that point, the facility had a remaining storage capacity of approximately 40,000 to 45,000 bushels spread over five grain bins. Jahraus did not authorize any further transfer of grain from the bin to maintain quality control in the facility.

Theodore John Simpson, a Tabor maintenance employee, testified to grain storage practices at the facility. He testified Jahraus had instructed the Tabor employees to limit the storage of grain in the bin to only the level of the seventh ring.

John Krischel, a second Tabor maintenance employee, also testified to the grain storage practices at the facility. He testified Jahraus had not included any reference point for measurement in instructing him to limit the storage of grain in the bin. Krischel last testified Jahraus had acknowledged the grain then stored exceeded the limitation level for the bin.

Darrell Greenlee, the owner of Greenlee Construction, testified to the construction of the foundations for the grain bins. He testified Long Point hired him to construct the foundations for the grain bins at its storage facility in 1966. Long Point had previously arranged for Jones to develop the original set of construction blueprints for the foundations. As instructed, he then followed these blueprints in constructing the foundations. Greenlee did not recall any other participation on the part of Long Point in the construction of the foundations.

George Cline, a Federal warehouse examiner, testified to his inspection of the grain storage facility. He testified the government had

licensed the grain storage facility at a total capacity of 345,000 bushels. Cline also testified the grain storage capacity was not related to any specific safety considerations for the facility.

Dean Wurth, an expert witness in structural engineering for Tabor, testified to his examination of the foundation of the grain bin. He determined the foundation was not level. He also found 36 cracks in the foundation of the grain bin. These cracks added 2.1 inches to the circumference of the foundation with a concomitant increase in the stress to the grain bin.

At trial, Wurth stated his belief, without any proof in substantiation, that the cracks started to form in the foundation at first storage of grain in the bin. Wurth also stated his belief as to the factors contributing to the collapse of the grain bin: (1) the pressure of the stored grain; (2) the cracks in the foundation; and (3) the changes in temperature. Specifically, the combination of these factors caused the vertical-seam bolts to shear from the steel plates of the grain bin. In conclusion, Wurth testified the collapse of the bin would not have been prevented had Tabor strictly adhered to the practice of limiting the storage of grain in the bin to only the level of the seventh ring.

Dennis Roby, a second expert witness in structural engineering for Tabor, testified to his examination of the grain bin and its foundation. The examination revealed: (1) the foundation had settled unevenly with excessive cracks and (2) the bolts had been stressed approximately 14% over their maximum service load. Roby next stated his belief as to the factors contributing to the collapse of the grain bin: (1) the bolts had been initially stressed to their maximum service load in design; (2) the original bolts had been reused in reerecting the grain bin at the storage facility; and (3) the foundation had settled unevenly with excessive cracks. Roby last testified the collapse of the bin would not have been prevented had Tabor strictly adhered to the practice of limiting the storage of grain in the bin to only the level of the seventh ring.

Dixon Stephens, the supervisor of the country elevators for Tabor, testified to the lease negotiations with Long Point. In part, Tabor based its entry into the lease agreement on the grain storage capacity of the facility. Tabor also based its rent on the grain storage capacity of the facility. As to the capacity of the facility, representatives of Long Point, Jerry and Otis, informed Stephens of its grain storage limitation practice. Stephens concluded this practice did not expressly preclude grain storage at the maximum capacity of the bin.

Joseph K. Adelman, an expert witness in mechanical engineering for Long Point, testified to his investigation into the collapse of the

grain bin. He refuted the opinions of the expert witnesses for Tabor. Adelman first testified the stress on the bin was proportionally related to the level of the stored grain. He next stated his belief as to the factors contributing to the collapse of the grain bin: (1) the pressure of the stored grain and (2) the improper design of the bin. Adelman last testified the bin was not structurally safe for the storage of grain at any point approaching maximum capacity.

Clifford Grimwood, a Tabor employee, testified to the initial discovery of the structural failure in the grain bin. Early in the afternoon of January 13, 1983, he observed a bushel or so of grain had apparently leaked from a four-bolt shear in the second ring of the bin onto the foundation and ground. Grimwood also observed the bolts in the first ring of the grain bin were still intact.

We first consider whether the circuit court erred in directing verdicts on negligence and *res ipsa loquitur* at trial, and conclude it did.

■ It is not a simple matter to determine when the evidence in an action is sufficient to justify removing a specific issue from the consideration of the jury. To aid the circuit court in this determination, the Illinois Supreme Court set forth a uniform standard on directed verdicts in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504. "[A verdict] ought to be directed \*\*\* only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick*, 37 Ill. 2d at 510, 229 N.E.2d at 513-14.) Thus, the circuit court may properly direct a verdict only when the evidence on an issue presents no factual question for the consideration of the jury.

■ Negligence, as a theory of recovery, consists of four separate elements: (1) duty, (2) breach, (3) damage, and (4) causation. (*Filipetto v. Village of Wilmette* (1985), 135 Ill. App. 3d 781, 784, 482 N.E.2d 358, 360.) The burden of proving each element rests with the plaintiff. Absent such proof, the plaintiff is not entitled to any recovery on negligence in the action.

■ We do not view the evidence on the duty, breach, and damage elements of the negligence theory of recovery as being controverted in this action. First, the owners of the adjacent parcels of real estate owe each other a duty of care as to safety in the maintenance and use of their respective properties. Second, Tabor stored grain in the bin beyond the capacity stated in the lease. Third, the property of Rittenhouse was indisputably damaged in the collapse of the grain bin. We therefore presume Rittenhouse met his burden of proving each of these three elements.

In contrast, we view the evidence on the causation element of the negligence theory of recovery as being controverted in this action. Specifically, the expert witnesses of the litigants did not concur in their opinions as to either the value of the grain storage limitation practice as a safety measure or the factors contributing to the collapse of the grain bin. As to the former opinion evidence, Wurth and Roby, the expert witnesses for Tabor, testified the collapse of the bin *would not* have been prevented had Tabor strictly adhered to the practice of limiting the storage of grain in the bin to only the level of the seventh ring. In addition, Adelman, the expert witness for Long Point, ultimately conceded the bin was not structurally safe for the storage of grain at any point approaching maximum capacity. As to the latter opinion evidence, the expert witnesses variously attributed the bin collapse to improprieties in its assembly, design, foundation, and operation. Thus, we cannot find Rittenhouse established, as a matter of law, that Tabor's overfilling of the bin was a substantial factor in its collapse. See W. Keeton, Prosser & Keeton on the Law of Torts §41, at 264-69 (5th ed. 1984); Restatement (Second) of Torts §431, at 428, comment *a*, at 429 (1965).

■ Under the doctrine of *res ipsa loquitur*, when applicable, the jury is allowed to infer the injury of the plaintiff was caused by the negligence of the defendant. (See *Walker v. Rumer* (1978), 72 Ill. 2d 495, 381 N.E.2d 689.) As with any inference, the burden of proof, in terms of both persuasion and production, shifts between the plaintiff and the defendant at trial. Initially, the plaintiff must prove only two elements: (1) his injury would not have occurred absent negligence and (2) his injury was caused by some instrumentality then in the control of the defendant. (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 238-41, 500 N.E.2d 8, 10-12.) In turn, the defendant may rebut these elements by showing a third party intervened to cause the injury of the plaintiff. *Senase v. Johns* (1981), 96 Ill. App. 3d 164, 169, 420 N.E.2d 1104, 1108.

■ Our review of the record indicates both Rittenhouse and Tabor met their respective burdens of proof under the doctrine of *res ipsa loquitur*. Rittenhouse showed Tabor had exclusive control over operation and control of the grain storage facility. Rittenhouse also showed the bin collapse could be attributed to improprieties in its operation. In rebuttal, however, Tabor showed the bin collapse could be attributed to improprieties in its assembly, design, and foundation. Given the controverted nature of the evidence, we find a question of fact arises whether Tabor successfully rebutted the inference that its negligence caused the injury to Rittenhouse.

We view the evidence as being controverted under both the negligence and the *res ipsa loquitur* theories of recovery. "Where a substantial factual dispute is presented by the evidence and where an assessment of the credibility of witnesses and an election between conflicting evidence may be decisive, it is erroneous to direct a verdict." (*Cokinis v. Maywood-Proviso State Bank* (1980), 81 Ill. App. 3d 1057, 1063, 401 N.E.2d 1077, 1083.) We therefore find the circuit court erred in directing verdicts on negligence and *res ipsa loquitur* at trial.

■ A jury will be influenced by any appearance of favoritism toward a litigant on the part of the circuit court. (See *Abrams v. City of Mattoon* (1986), 148 Ill. App. 3d 657, 663, 499 N.E.2d 147, 151.) In directing the verdicts on negligence and *res ipsa loquitur*, given the controverted nature of the evidence, the circuit court impermissibly appeared to favor Rittenhouse and Long Point over Tabor at trial. Such an appearance of favoritism on the part of the circuit court, though unintentional, irrevocably tainted the subsequent consideration of the jury on all remaining tort recovery issues in the action. (See *McMillen v. Carlinville Area Hospital* (1983), 114 Ill. App. 3d 732, 733, 450 N.E.2d 5, 7.) We therefore remand this action to the circuit court for a new trial on the issue of recovery under the tort theories of negligence, *res ipsa loquitur*, and wilful and wanton misconduct.

Tabor also contends the circuit court erred in denying its motion *in limine* to bar any reference to the grain storage limitation practice of Long Point at trial. We disagree.

■ Tabor based its motion on the parol evidence rule. (*Davis v. Buchholz* (1981), 101 Ill. App. 3d 388, 391, 428 N.E.2d 198, 200.) In support of its motion *in limine*, Tabor specifically argued the Ruff brothers should be precluded from testifying about their grain storage limitation practice because that testimony would have the effect of altering the express meaning of the underlying lease agreement, which did not include any similar limitation within its terms. The circuit court denied the motion and ruled the testimony admissible for the limited purpose of showing Tabor had notice of the dangerous condition of the grain bins at the storage facility.

We do not believe Tabor properly preserved this contention for appellate review. Following the denial of its motion *in limine*, Tabor never renewed its parol evidence objection to the testimony of the Ruff brothers on their grain storage limitation practice at trial. Instead, as a strategic matter, Tabor elected to attack that storage practice on its economic and scientific bases throughout the course of the trial. Under these circumstances, we conclude Tabor has waived con-

sideration of this contention on appeal. See *Department of Public Works & Buildings v. Roehrig* (1976), 45 Ill. App. 3d 189, 195, 359 N.E.2d 752, 759.

Waiver aside, we do not believe Tabor could prevail on its motion *in limine* as a matter of law. First, the parol evidence rule applies to only the parties to the written agreement. (*Northern Assurance Co. v. Chicago Mutual Building & Loan Association* (1902), 198 Ill. 474, 64 N.E. 979.) Since Rittenhouse is not a party to the underlying lease agreement, he remains free to elicit testimony on the grain storage limitation practice of the Ruff brothers at trial. (See *General Casualty Co. v. Elam* (1972), 8 Ill. App. 3d 215, 222-25, 289 N.E.2d 699, 704-06.) Second, parol evidence may be admissible to show the concerns of the parties prior to and contemporaneous with the signing of the written agreement. (*URS Corp. v. Ash* (1981), 101 Ill. App. 3d 229, 234-35, 427 N.E.2d 1295, 1299-1300; see also *Sunstream Jet Express, Inc. v. International Air Service Co.* (7th Cir. 1984), 734 F.2d 1258.) As a result, Long Point may also seek to use that testimony to show notice of an unsafe condition on the part of Tabor. Accordingly, the circuit court did not err in denying the motion.

Tabor next contends the circuit court erred in denying its motion *in limine* to bar any reference to the earlier collapse of the sister grain bin at trial. We again disagree.

■ In Illinois, a party may introduce evidence of a prior accident to show notice of the existence of a dangerous condition. (*Henderson v. Illinois Central Gulf R.R. Co.* (1983), 114 Ill. App. 3d 754, 757, 449 N.E.2d 942, 944.) The admissibility of such evidence is not dependent on any factual similarity between the accidents. *Henderson*, 114 Ill. App. 3d at 758, 449 N.E.2d at 945; see also *First National Bank v. Illinois Central Gulf R.R. Co.* (1978), 62 Ill. App. 3d 36, 378 N.E.2d 1329.

■ Applying these principles here, the circuit court did not err in denying the motion *in limine* of Tabor. The evidence of the earlier collapse of the sister grain bin is relevant to explain the grain storage practices of both Long Point and Tabor. Following the collapse of the sister bin, Long Point had structural reinforcements added to the remaining bin. Long Point also had that bin inspected by its manufacturer. Although the bin passed inspection, as an added safety measure, Long Point thereafter limited the storage of grain in the bin to the level of the seventh ring. In contrast, Tabor apparently chose to rely on this safety inspection in discontinuing the grain storage limitation practice during its operation of the facility. As this evidence may be variously construed to support both Long Point and Tabor, the

jury, as the trier of fact, should determine its proper probative value.

■■ Tabor additionally contends the circuit court erred in allowing Dean Ruff to testify concerning the property losses of Long Point. We disagree.

At trial, Long Point called Dean to testify concerning the value of its property losses as a result of the bin collapse. Tabor argued Dean should not be allowed to testify as Long Point had not disclosed him as an expert witness pursuant to Supreme Court Rule 220. (107 Ill. 2d R. 220.) Long Point countered that Dean was a layperson witness as opposed to an expert witness. We agree, as did the circuit court, that Dean is not an expert witness subject to the disclosure requirements of Supreme Court Rule 220.

Supreme Court Rule 220 governs the disclosure of expert witnesses. It is "intended to facilitate trial preparation * * * by eliminating the last-minute disclosure of [any critical expert opinion] on the courthouse steps or during the course of trial." (107 Ill. 2d R. 220, Committee Comments at 354.) Although Supreme Court Rule 220 took effect after this action had originally commenced, it was a procedural change and should apply in full force on remand.

In Illinois, the valuation of property is a question of fact. (*Central Illinois Light Co. v. Porter* (1968), 96 Ill. App. 2d 338, 342, 239 N.E.2d 298, 301.) As a result, any person with special knowledge of the subject property is thereby qualified to testify as a valuation witness. (*Porter*, 96 Ill. App. 2d at 342, 239 N.E.2d at 301.) In this action, Dean has acquired such knowledge through his employment as president of Long Point. (See *Department of Public Works & Buildings v. Atkins* (1966), 68 Ill. App. 2d 98, 103, 215 N.E.2d 452, 455.) Under these circumstances, Dean was qualified to testify as a valuation witness for Long Point in the action. See *Diminskis v. Chicago Transit Authority* (1987), 155 Ill. App. 3d 585, 589-91, 508 N.E.2d 215, 219-20, *aff'd* (1988), 124 Ill. 2d 226, 529 N.E.2d 525.

Tabor further contends the circuit court applied an improper measure of damages for property loss recovery at trial. We agree in part.

At trial, Rittenhouse and Long Point sought to introduce replacement-cost evidence in building their respective damage cases. Tabor objected in both instances. The circuit court overruled the objections, and the evidence went before the jury for the calculation of compensatory damages.

■■ An award of damages aims at compensating the injured party for damage to his property. (*Roark v. Musgrave* (1976), 41 Ill. App. 3d 1008, 1011, 355 N.E.2d 91, 94.) The goal is to restore the party to the equivalent of his rightful preinjury position. Restatement

(Second) of Torts §901, comment *a*, at 452 (1979).

 We view the damaged property in dispute, namely a storage building on the farm of Rittenhouse together with the grain bin and related drying equipment at the storage facility of Long Point, as income-producing fixtures attached to realty. (See *National Boulevard Bank v. Citizens Utilities Co.* (1982), 107 Ill. App. 3d 992, 1001, 438 N.E.2d 471, 478.) Where a fixture is totally destroyed, or so damaged as to render repair impracticable, the proper measure of recovery is generally the diminution in the fair market value of the realty. (*Arras v. Columbia Quarry Co.* (1977), 52 Ill. App. 3d 560, 564-65, 367 N.E.2d 580, 583-84; *Myers v. Arnold* (1980), 83 Ill. App. 3d 1, 7-8, 403 N.E.2d 316, 321; see also *Williams-Bowman Rubber Co. v. Industrial Maintenance, Welding & Machining Co.* (N.D. Ill. 1987), 677 F. Supp. 539.) That rule may be supplanted with replacement-cost evidence only when the damaged fixture "has a distinct value without reference to the real estate upon which it stands." *Kremeyer v. Shumate* (1959), 20 Ill. App. 2d 542, 546, 156 N.E.2d 271, 273-74.

 Applying these principles, we conclude the circuit court should allow Rittenhouse to introduce replacement-cost evidence at the proceedings on remand. Rittenhouse established his storage building, a relatively new structure, had been maintained in near-perfect condition for use as a display model until its destruction. Taken together, these facts are sufficient to support departure from the ordinary rule of recovery. (See *Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 936, 419 N.E.2d 578, 595.) In contrast, Long Point showed its old equipment had already seen hard use by the time the grain bin collapsed at the storage facility. Long Point is thus not entitled to use replacement costs to profit from its commercial injuries. See *Johnson v. Pagel Clikeman Co.* (1951), 343 Ill. App. 346, 99 N.E.2d 148.

Tabor last contends the circuit court erred in dismissing two of its third-party complaints against Natco and Greenlee Construction under the construction statute of repose. Ill. Rev. Stat. 1983, ch. 110, par. 13—214(b).

Actions against business entities for an act or an omission in construction are governed by section 13—214 of the Code of Civil Procedure. That section provides in pertinent part:

> "(b) No action based upon tort, contract or otherwise may be brought against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property after 12 years have elapsed from the time of such

act or omission. However, any person who discovers such act or omission prior to expiration of 12 years from the time of such act or omission shall in no event have less than 2 years to bring an action as provided in sub-section (a) of this Section." Ill. Rev. Stat. 1983, ch. 110, par. 13—214(b).

■■ A statute of repose is not a statute of limitation. The former affects substantive rights; the latter affects procedural rights. Specifically, a statute of repose "extinguishes the right of action itself *before* it [accrues]." (Emphasis in original.) (*Thornton v. Mono Manufacturing Co.* (1981), 99 Ill. App. 3d 722, 726, 425 N.E.2d 522, 525.) In contrast, a statute of limitation "governs the time within which lawsuits may be commenced *after* [the right] of action [accrues]." (Emphasis in original.) *Thornton*, 99 Ill. App. 3d at 726, 425 N.E.2d at 525.

This action involves the prospective application of the construction statute of repose. (Ill. Rev. Stat. 1983, ch. 110, par. 13—214(b); *Hartford Fire Insurance Co. v. Architectural Management, Inc.* (1987), 158 Ill. App. 3d 515, 511 N.E.2d 706; *La Salle National Bank v. Edward M. Cohon & Associates, Ltd.* (1988), 177 Ill. App. 3d 464, 532 N.E.2d 314; see also *Hayes v. Mercy Hospital & Medical Center* (1990), 136 Ill. 2d 450.) Under this statute, a litigant must discover his cause of action within a 12-year period following the completion of construction. He then has an additional two-year period in which to file suit. Thus, the statute of repose limits the "discovery rule" (see *Champaign County Nursing Home v. Petry Roofing, Inc.* (1983), 117 Ill. App. 3d 76, 452 N.E.2d 847) in actions against business entities for an act or an omission in construction. *Reichelt v. Urban Investment & Development Co.* (N.D. Ill. 1984), 577 F. Supp. 971, 974.

■■ Tabor had no inchoate third-party causes of action prior to either the initial enactment or the instant reenactment of the construction statute of repose. Rather, Tabor discovered its third-party causes of action only at the time of the collapse of the grain bin on January 13, 1983. (See *Erdie v. Central Illinois Public Service Co.* (1988), 175 Ill. App. 3d 1050, 1053-54, 530 N.E.2d 514, 517.) This was approximately three years after the initial enactment of the construction statute of repose (Ill. Rev. Stat., 1980 Supp., ch. 83, par. 22.3) on November 29, 1979, and approximately six months after the effective date of its instant reenactment (Ill. Rev. Stat. 1983, ch. 110, par. 13—214(b)) on July 13, 1982. *Blackwood v. Rusk* (1986), 148 Ill. App. 3d 868, 500 N.E.2d 69.

The grain bins were reerected at the storage facility in 1966. It is undisputed this is the last involvement on the part of Greenlee Construction and Natco with the grain bin. Tabor did not file its third-

party complaints until March 1985. This was approximately 20 years after the reerection of the grain bin, approximately three years after the instant reenactment of the construction statute of repose, and approximately two years after the collapse of the grain bin. Accordingly, Tabor was time barred from filing third-party complaints against Greenlee Construction and Natco under the construction statute of repose. Ill. Rev. Stat. 1983, ch. 110, par. 13—214(b).

The circuit court erred in directing verdicts on negligence and *res ipsa loquitur* at trial. That error tainted the subsequent jury verdicts on tort recovery in the action. Accordingly, the directed verdict in favor of Rittenhouse and against Tabor on a negligence theory is reversed. The directed verdict in favor of Tabor and against Rittenhouse on a theory of *res ipsa loquitur* is reversed. The directed verdict in favor of Long Point and against Tabor on theories of negligence and indemnification is reversed. In short, all directed verdicts are reversed. Further, the jury verdicts in favor of Rittenhouse and against Tabor for compensatory damages on the negligence theory and punitive damages on the wilful and wanton theory are reversed. The jury verdicts in favor of Long Point and against Tabor for compensatory damages on a negligence theory and for punitive damages on a wilful and wanton theory and on the contribution counterclaim of Tabor are reversed. In sum, all jury verdicts are reversed save for the jury verdict in favor of Long Point and against Tabor for rent, and that verdict is affirmed. The trial court's dismissals of the third-party complaints against Nataco and Greenlee Construction are affirmed. We therefore remand this cause for a new trial on the issue of recovery under the tort theories of negligence, *res ipsa loquitur*, and wilful and wanton misconduct.

Affirmed in part, reversed in part, and remanded for further proceedings.

SPITZ and GREEN, JJ., concur.