SEEGERS GRAIN COMPANY, INC., Plaintiff-Appellant, v. UNITED STATES STEEL CORPORATION, Defendant-Appellee (Kansas City Millwright Company, Defendant).

First District (3rd Division) No. 1—87—3574

█

Opinion filed August 14, 1991.

█

█

---

*This case has been decided after the resignation of Justice Michel Coccia. Justice Anthony Scariano has read the briefs, listened to the tape of the oral argument and participated in the decision of this case in place of Justice Michel Coccia.

Robert A. Clifford & Associates, of Chicago (Robert A. Clifford, Keith A. Hebeisen, and Robert P. Sheridan, of counsel), for appellant.

Gessler, Flynn, Laswell, Fleischmann, Hughes & Socol, Ltd., of Chicago (George W. Gessler and William P. Jones, of counsel), for appellee.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff Seegers Grain Company, Inc. (Seegers), brought an action against defendants United States Steel Corporation (U.S. Steel), Kansas City Millwright Company (KCM), and Design Consultants, Inc. (Design Inc.), to recover damages that it suffered when there was "a sudden and calamitous failure and collapse" of one of its steel grain storage tanks which destroyed the tank and caused "damage to the corn contained therein, other storage tanks, conveyor belts, trucks, fans and trees in the immediate vicinity." Design Inc. was dismissed from the suit prior to trial, pursuant to a settlement agreement. U.S. Steel filed motions to strike and dismiss breach of implied warranty of merchantability and implied warranty of fitness counts in the seventh and eighth amended complaints, which were denied. At the close of the evidence at trial, the trial court granted U.S. Steel's motion for a directed verdict on the product liability count. At the same time, the trial court ruled that as a matter of law U.S. Steel had no duty with respect to certain allegations in the negligence count, and struck those allegations. The case went to the jury on the negligence and breach of implied warranty counts against U.S. Steel and KCM.

The jury returned verdicts in favor of Seegers and against KCM on all three counts, and assessed Seegers' recoverable damages in the amount of $2,225,000. The jury also returned verdicts finding U.S. Steel not guilty on all three counts. Seegers appeals from the judgment on the verdicts in favor of U.S. Steel. No other appeals or cross-appeals have been taken.

On appeal Seegers contends that (1) the trial court erred in directing a verdict in favor of U.S. Steel on the product liability count; (2) the trial court erred in denying its motion for a directed verdict on

the breach of implied warranty counts; and (3) the trial court erred in ruling that as a matter of law U.S. Steel had no duty with respect to certain allegations in the negligence count, and in striking those allegations. We reverse the directed verdict in favor of U.S. Steel on the product liability count; vacate the verdicts and judgment on the breach of implied warranty counts and strike and dismiss those counts as a matter of law; and reverse the trial court's rulings and vacate the verdict and judgment on the negligence count. We remand for a new trial on the product liability and negligence counts.

Seegers owned and operated a large public grain conveyor and grain storage business in Crystal Lake, McHenry County, Illinois, serving Illinois farmers since 1962. It had several relatively small grain storage tanks. In the spring of 1976, however, it decided to build a huge grain storage tank with a one-million-bushel grain capacity. After taking bids for the project, in May 1976 Seegers signed a contract with KCM to construct the storage tank. KCM was a construction company that specialized in field-erected, welded steel storage tanks. It did not, however, manufacture parts or accessories.

KCM's design division manager, Myron Leveridge, designed and made all of the design decisions for the tank. The design and construction of the foundation for the tank, however, were not included in KCM's contract with Seegers, and Leveridge recommended that Seegers retain Design Inc. to design the foundation. Subsequently, Seegers hired Design Inc. to design the foundation, but Seegers undertook the construction of the foundation. Seegers acted as the general contractor for construction of the foundation.

Leveridge designed a circular tank with a roof that was shaped like a cone with a 12-foot flat top that was circular. The tank had a base diameter of 159 feet and 2 inches, and the circular wall was 48 feet high. The tank measured 86 feet and 37/8 inches from the top at the center of the roof to the bottom of the tank.

The circular wall was made by flexing and welding together eight-foot-high steel plates that were 20 and 30 feet in lineal length. There were six rows of steel plates that were welded together from top to bottom, accounting for the 48-foot-high circular wall. The thickness of the steel plates depended on which of the six rows of the steel plates were used; the thicker steel plates were used on the lower rows. The bottom row was five-eighths inch thick. The thickness of each succeeding higher row was as follows: nine-sixteenths inch; one-half inch; seven-sixteenths inch; three-eighths inch; and five-sixteenths inch. Two access doors were provided in the bottom row of the steel plates.

One access door was three feet by three feet six inches, and the other access door was seven feet by eight feet.

The conical roof of the tank was made by welding together 12-gauge sheet steel. The roofing sheets were also welded to steel roof joists that were placed radially around the tank. The roof joists were supported by the circular wall of the tank and a flat 12-foot compression ring at the top of the roof in the center of the tank.

The tank was supported by a periphery foundation and the floor of the tank, which was an eight-inch concrete slab. The foundation and slab were designed by Design Inc.

After he designed the tank, but prior to its construction, Leveridge contacted the Kansas City district sales office for U.S. Steel and ordered the steel plates. He spoke to James Hickman, U.S. Steel's inside salesman at the sales office. Leveridge ordered 102 steel plates which were designated as A283 C steel plates. A U.S. Steel handbook, entitled Handbook of USS Plate Steels (Handbook), provides:

| Type of Steel USS Designation | Characteristics | Applications |
| --- | --- | --- |
| ASTM A283 Grades A,B,C & D. | Low and intermediate tensile strength, formable. | Storage tank construction, above and below ground. |

The Handbook also provides:

"**USS ASTM A283**

**General Description**

Low and intermediate tensile strength carbon steel plates of structural quality.

**Application**

Popular applications requiring some forming because of its low strength. It is often referred to as 'tank steel' since it is widely used for fabrication of both above ground and below ground storage tanks."

The ASTM designation in the Handbook refers to American Society for Testing and Materials. A283 is a standard ASTM designation which is used industry-wide.

U.S. Steel's written order acknowledgment for the purchase of the A283 C steel plates by Leveridge states that they were to be used to construct a field-erected tank for Seegers at the designated jobsite in Crystal Lake, Illinois. The order acknowledgement also states that the plates were to be in six sets of different thickness: five-eighths

inch; nine-sixteenths inch; one-half inch; seven-sixteenths inch; three-eighths inch; and five-sixteenths inch.

In addition, the order acknowledgement states that each of the six sets consisted of a total of 17 plates, 16 plates that were 30 feet long and one plate that was 20 feet long. The order acknowledgment also provides that the plates were to be shipped in sets, in sequential order with the thickest, or heaviest, set to be shipped first. Specifically, the order acknowledgement states: "Items must ship in sequence. Do not mix thickness. Heaviest plates must ship first." Leveridge testified that he told U.S. Steel representatives that KCM built these types of tanks in rings going from the bottom up, thick to thin, and that is why the plates had to be shipped in sequence.

The construction of the tank was completed on October 23, 1976. It was filled with grain for the first time on November 15, 1976. After the tank was in service, cracks in the foundation occurred which were immediately repaired. Also, a crack was found at the top of the northern corner of the small access door in April 1977. It was immediately repaired by KCM. A bulge also developed on each side of the large access door. This problem was immediately repaired in September 1977.

On January 10, 1978, the tank was filled with approximately one million bushels of corn. At about 12:30 a.m., the occurrence in question took place. The record demonstrates that there was a violent sudden implosion or bursting of the tank, causing destruction of the tank, strewing the approximately one million bushels of corn in the snow and substantially diminishing its value, damaging other nearby tanks, damaging a nearby truck and damaging other property from the sudden and dangerous occurrence. It was "like a rifle shot" and "a shock wave." With respect to damage to other property, U.S. Steel acknowledges in its brief that "the damages to personal property of Seegers *other than the tank*" were $94,302.54. (Emphasis added.)

On January 8, 1978, the temperature was 35° Fahrenheit. Then there was a sharp drop in temperature. At the time of the occurrence on January 10, 1978, the temperature had dropped to minus 10° Fahrenheit.

A chemical engineer and metallurgist, Nathan A. Tiner, testified that A283 C steel was not fit and not suitable for the purpose of a grain storage tank where temperatures could be at or below zero degrees Fahrenheit. He also testified that the unfitness and unsuitability of the A283 C steel was the primary cause of the occurrence.

Tiner testified that the A283 C steel was unreasonably dangerous for the erection of the Seegers tank at the time the steel plates left

the control of U.S. Steel because of the weather conditions where the tank was located. He stated that the A283 C steel plates were unreasonably dangerous at the time of sale by U.S. Steel because the steel was of a metallurgical composition that when exposed to zero degrees Fahrenheit its fracture toughness was reduced, and because it becomes brittle and makes it difficult to distribute the stresses. He testified that the unreasonably dangerous condition of the steel plates was a cause of the occurrence.

Tiner also testified as follows:

"Q. Finally, do you have an opinion based upon a reasonable degree of certainty in your area of specialty as to whether or not the steel was unreasonably dangerous because it was sold without warnings that it was susceptible to brittle fracture when used for its foreseeable and intended purposes, namely in service areas of zero F. or below?

A. Yes

Q. What is your opinion?

A. My opinion is the common designer [*i.e.*, in this case, KCM or Leveridge] there doesn't keep a metallurgist on his staff. He doesn't know, just that steel is not steel at lower temperatures there. Some people who have metallurgical knowledge should tell him that. And he usually relies upon the seller, who is competent on the application of these. And he apparently either didn't get it, didn't understand. And [they] didn't make very clear to him what the problem is.

Q. Is that a cause of the collapse in question?

A. That is the primary cause of the collapse."

A civil and structural engineer, Edward Earle Walters, testified that a representation that A283 C steel is popular for tank steel "would be totally erroneous." He stated that "it is a brittle steel and it is definitely not the type of steel that should be used for a semifluid material," such as grain. He also testified that if the temperature reached anywhere from 6 to 10 below zero degrees Fahrenheit it puts A283 C steel "into the brittle fracture mode of failure," which means that it will stress fracture. Walters testified that the A283 C steel was unreasonable for use in a grain tank in Crystal Lake, Illinois, because of its metallurgical characteristics. He testified that it was subject to cracking and failure in the structure for which it was used.

In addition, Walters testified that the cause of the occurrence was an overstressing of the tank wall. He testified that A283 C steel is a steel that "certainly should not be used in this type of structure," be-

cause it is subject to brittle failure and it will not redistribute stress properly. He testified that "it fails suddenly."

Walters also testified that the cause of the occurrence was the overstressing of the A283 C steel that was used at the top and bottom corners of the big access door. He testified, however, that the repairs that were done to the small and large access doors did not cause or contribute to the cause of the occurrence. He also testified that the occurrence was not caused by any differential vertical movement of the foundation.

In addition, Walters testified that those characteristics and properties of the A283 C steel that were used for the Seegers tank were present at the time the steel left the control of U.S. Steel. He also testified that U.S. Steel should have known the physical characteristics of this steel when it was produced and sold. Moreover, he testified that "the character of the steel" was a cause of the occurrence.

Walters also testified that the A283 C steel plates were sold by U.S. Steel for the Seegers tank without any warning to the user that it was a dangerous material to use and that the A283 C steel plates were therefore unreasonably dangerous for use. He also testified that "failure to warn of the condition of the steel was the cause of the failure of the tank."

■■ We initially address the issue of whether the trial court properly directed a verdict in favor of U.S. Steel on the product liability count. U.S. Steel first argues that it is not liable under product liability law because KCM substantially modified the steel plates by welding them together and fabricating the tank. U.S. Steel relies upon section 402A of the Restatement (Second) of Torts (1965), which provides:

> "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
> ***
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."

The limiting factor in section 402A of the Restatement (Second) of Torts, upon which U.S. Steel relies, is that there is no liability if the injury arises by reason of a change in the product after it is sold.

■ Here, the steel plates were in an unreasonably dangerous condition if they failed to perform in a manner reasonably to be expected in light of their nature and intended function. (*Hunt v. Blasius* (1978), 74 Ill. 2d 203, 211, 384 N.E.2d 368, 372; *Dunham v. Vaughan &*

*Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 342, 247 N.E.2d 401, 403.) At the time that the steel plates were sold by U.S. Steel, their nature and intended function was to be welded together to fabricate a field-erected grain storage tank located in a cold weather climate. Plainly, the nature and intended function of the steel plates was not changed or modified by KCM when it welded them together to fabricate the Seegers tank.

It is therefore clear that there was no change or modification in the steel plates which would bar U.S. Steel's exposure to product liability for manufacturing and selling an unreasonably dangerous product. The limiting factor in section 402A of the Restatement (Second) of Torts is simply not applicable here. U.S. Steel's argument is without merit.

U.S. Steel next argues that "the law does not recognize an action for strict liability under section 402A of the Restatement (2d) of Torts" in this case because "the evidence established that the collapse was not a sudden and calamitous event." U.S. Steel argues that if the occurrence was not a sudden and calamitous event then this case is solely for economic loss and there cannot be recovery for solely economic loss in a tort action. *Vaughn v. General Motors Corp.* (1984), 102 Ill. 2d 431, 434-36, 466 N.E.2d 195, 196-97; *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 81-83, 435 N.E.2d 443, 448-49.

U.S. Steel's argument that the occurrence was not a sudden and calamitous event is premised on the fact that prior to the occurrence there had been cracks in the foundation and problems with both access doors. The foundation cracks, however, had been repaired long before the occurrence and there was no evidence that the foundation was a cause of the occurrence. Moreover, the record clearly shows that the foundation was not a cause of the occurrence. With respect to the access doors, a crack was found on the top of the northern corner of the small access door in April 1977. It was immediately repaired. Also, a bulge developed on each side of the large access door. This was immediately repaired in September 1977. U.S. Steel concludes that because of these prior problems and repairs, the occurrence on January 10, 1978, was not sudden and calamitous. The conclusion is a *non sequitur*.

The fact that there had been repairs to the foundation and access doors, at least three months prior to the time of the occurrence, does not mean that the occurrence was not a sudden and calamitous event. Indeed, the occurrence was described as being "like a rifle shot" and "a shock wave," and there was, at least, some damage to

other tanks and a truck that was nearby. There is also testimony that A283 C steel "fails suddenly." Moreover, there is absolutely no evidence that the occurrence was anything but a sudden and violent implosion or bursting of the tank. Plainly, the corn which was strewn on the snow did not leak out of the tank over a period of time. U.S. Steel's argument that the occurrence was not a sudden and calamitous event is devoid of merit.

U.S. Steel next contends that the tank was an improvement to real estate. U.S. Steel then argues that even if its steel plates were unreasonably dangerous, product liability law is not applicable to an action resulting from a condition of the unreasonably dangerous steel plates because they were part of the real estate. We disagree.

■ Whether a manufacturer is subject to product liability is determined by what the manufacturer sold at the time it left the manufacturer's control. Here, at the time the steel plates were sold by U.S. Steel, they were precisely measured products to be delivered in sets and in sequential order, depending on their thickness. Thus, since the steel plates were a product at the time they left the control of U.S. Steel, it is subject to product liability if the steel plates failed to perform in a manner reasonably to be expected in light of their nature and intended function (*Hunt v. Blasius* (1978), 74 Ill. 2d 203, 211, 384 N.E.2d 368, 372; *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 342, 247 N.E.2d 401, 403), or U.S. Steel failed to warn of a danger or failed to instruct on the proper use of the steel plates (*Fugate v. Sears, Roebuck & Co.* (1973), 12 Ill. App. 3d 656, 676, 299 N.E.2d 108, 123). This conclusion will effectuate the policy basis for imposing strict liability in tort law. *Board of Education v. A, C & S, Inc.* (1989), 131 Ill. 2d 428, 451, 546 N.E.2d 580, 591.

In *Board of Education*, the court held:

"In regard to the strict products liability count, the trial court ruled that the ACMs [asbestos containing materials] were components and indivisible parts of the building and as such were not a product for strict liability purposes. An item will be considered a product for purposes of the cause of action if to do so will effectuate the policy basis for imposing strict liability in tort. (*Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 204.) In *Hammond*, we held that raw asbestos was a product for the purposes of a strict liability action. (97 Ill. 2d at 205.) The ACMs involved in this case include acoustic plaster, acoustic tile, boiler insulation, pipe insulation and spray-on fireproofing. The fact that these are used in construc-

tion and have been installed in a building does not detract from their nature as products separate from the actual structure. We cannot accept the defendant's argument that these ACMs have become permanent fixtures upon real property, indistinguishable from the buildings themselves, and to do so would defeat the underlying policy reasons for imposing [strict liability in tort]." 131 Ill. 2d at 451, 546 N.E.2d at 591.

Likewise, in the present case U.S. Steel's argument would defeat the underlying policy reasons for imposing strict liability in tort. If the steel plates which U.S. Steel made, sold and delivered proved to be unreasonably dangerous for their intended use, U.S. Steel cannot be shielded from product liability by claiming that its product was real estate. U.S. Steel's argument is untenable.

Next, we address the breach of implied warranty of merchantability and implied warranty of fitness for a particular purpose counts, which were brought pursuant to the Uniform Commercial Code (UCC). (Ill. Rev. Stat. 1989, ch. 26, pars. 2—314, 2—315.) Seegers argues that the trial court erred in denying its motion for a directed verdict on the breach of implied warranty counts. U.S. Steel filed motions to strike and dismiss the implied warranty counts in the seventh and eighth amended complaints, which were denied. U.S. Steel argues on appeal, in part, that as a matter of law "no liability attached to U.S. Steel on warranty theories."

By the time the seventh and eighth amended complaints were filed it was plain from the pleadings that this is a case to recover non-economic loss in relation to a product, and no personal injury is involved. Thus, as a matter of law there is no action for breach of implied warranty under the UCC. The breach of implied warranty counts under the UCC should have been dismissed by the trial court as a matter of law, and they should not have been submitted to the jury.

■ Ever since the supreme court decided *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 88, 435 N.E.2d 443, 451, it has been established law in Illinois that recovery for solely economic loss in relation to a product must be had within the framework of contract law. No action for solely economic loss in relation to a product may be had on theories of tort law, *i.e.*, negligence or product liability. *2314 Lincoln Park West Condominium Association v. Mann, Gin, Ebel & Frazier, Ltd.* (1990), 136 Ill. 2d 302, 307-09, 555 N.E.2d 346, 348-49; *Board of Education v. A, C & S, Inc.* (1989), 131 Ill. 2d 428, 439-40, 546 N.E.2d 580, 585; *Szajna v. General Motors Corp.* (1986), 115 Ill. 2d 294, 303, 304, 503 N.E.2d 760, 764; *Scott &*

*Fetzer Co. v. Montgomery Ward & Co.* (1986), 112 Ill. 2d 378, 387-88, 493 N.E.2d 1022, 1025-26; *Vaughn v. General Motors Corp.* (1984), 102 Ill. 2d 431, 436, 466 N.E.2d 195, 196-97.

 █ Economic loss in relation to a product has been defined as damages for inadequate value, cost of repair and replacement of the defective product, or consequential loss of its profits, provided there is no claim for personal injury or damage to other property. In actions to recover for solely economic loss, contract law and the UCC afford the parties their remedies and defenses. On the other hand, when a product is sold in a defective condition that is unreasonably dangerous to the user or consumer or to his property, resulting in personal injury or damage to property from a sudden and dangerous occurrence, the loss is noneconomic in relation to the product. In such instances tort law affords the parties their remedies and defenses. *Board of Education v. A, C & S, Inc.,* 131 Ill. 2d at 440, 546 N.E.2d at 590; *Moorman Manufacturing Co. v. National Tank Co.,* 91 Ill. 2d at 82, 435 N.E.2d at 449.

██ A noneconomic loss case that bears examination here is *Berry v. G.D. Searle & Co.* (1974), 56 Ill. 2d 548, 309 N.E.2d 550, which was decided eight years before *Moorman* defined and distinguished economic loss and noneconomic loss actions. In *Berry,* the court allowed personal injury cases to be maintained as breach of implied warranty actions under the UCC without privity between the plaintiff and a remote manufacturer. (56 Ill. 2d at 558, 309 N.E.2d at 556.) The decision was made, however, for public policy reasons. (See *Szajna v. General Motors Corp.* (1986), 115 Ill. 2d 294, 303-304, 503 N.E.2d 760, 763.) Thus, as a public policy exception, where personal injury is involved a breach of implied warranty action under the UCC may be maintained for noneconomic loss in relation to a product.

 █ It follows from a review of *Moorman* and its progeny, and *Berry,* that where no personal injury is involved, actions to recover noneconomic loss in relation to a product must be had within the framework of tort law, and no contract or implied warranty action under the UCC will lie. In addition, just as the issue of whether an action for *res ipsa loquitur* exists is a question of law to be decided by the court (*Imig v. Beck* (1986), 115 Ill. 2d 18, 27, 503 N.E.2d 324, 329), the issue of whether an action is one for economic or noneconomic loss is a question of law to be decided by the court. Having courts decide these issues as a matter of law allows courts to exercise their responsibility for a sound and uniform body of precedent without sacrifice to the just remedies and defenses of the parties.

Where, as here, a case involves a sudden violent implosion or bursting of a huge grain storage tank, causing destruction of the tank, strewing approximately one million bushels of corn in the snow and substantially damaging its value, damaging other nearby tanks, damaging a nearby truck and damaging other property from the sudden and dangerous occurrence, the only conclusion that can be reached is that as a matter of law the case involves noneconomic loss in relation to the product that was a cause of the occurrence.

The breach of implied warranty counts in this case should therefore have been stricken and dismissed as a matter of law because the case involves noneconomic loss in relation to the product, and no personal injury is involved. Tort law, and not contract law or implied warranties under the UCC, affords Seegers its remedy and U.S. Steel its defenses.

For the reasons we have stated, the trial court erred in denying U.S. Steel's motions to strike and dismiss the breach of implied warranty counts. As a matter of law, the case should not have gone to the jury on the breach of implied warranty counts. The verdicts and judgment on the breach of implied warranty counts must therefore be vacated, and the breach of implied warranty counts stricken and dismissed as a matter of law.

We next address the trial court's rulings involving the negligence count. The trial court ruled that as a matter of law U.S. Steel had no duty to warn Seegers of the possible "catastrophic fracture of its tank" because the steel was brittle, "when defendant knew or should have known of other such failure of similar tanks constructed utilizing A283C steel prior to January 10, 1978, including the one at Kokomo, Indiana." The trial court also ruled that as a matter of law U.S. Steel had no duty to inform Seegers of the results of "impact testing conducted upon the steel from the Kokomo, Indiana tank." As part of its order, the trial court struck those two allegations from the eighth amended complaint.

The Kokomo, Indiana, occurrence to which the eighth amended complaint makes reference involved the sudden violent implosion or bursting of a field-erected grain storage tank. Kokomo, Indiana, is located less than 175 miles from where the occurrence involving the Seegers tank took place.

The Kokomo tank was constructed for and owned by the Kokomo Grain Company. The construction was done at the jobsite by KCM, using the same kind of U.S. Steel plates that were used for the Seegers tank. The steel plates for both tanks were purchased from the same U.S. Steel office.

The Kokomo tank was designed and constructed in the same manner and configuration as the Seegers tank although the Kokomo tank had a 750,000-bushel capacity, rather than the one-million-bushel capacity of the Seegers tank. Both tanks had two access doors, a conical roof with radial joists, a flat compression ring at the top of the conical roof and a concrete foundation.

The construction of the Kokomo tank was completed in the fall of 1976 and filled for the first time on November 10, 1976. On November 15, 1976, at about 4 a.m., while the tank was filled with corn, there was a violent implosion or bursting of the tank, destroying the tank. The temperature at the time was 26° Fahrenheit. Shortly before the occurrence the temperature had dropped 12 degrees.

A civil and structural engineer, Edward E. Walters, was hired by KCM to investigate the cause of the Kokomo tank occurrence. Later, he also investigated the cause of the Seegers tank occurrence. Also, U.S. Steel conducted its own investigation of both occurrences. The investigations included impact testing of samples of the steel plates that were used in the construction of the tanks.

Walters testified that the failure modes, i.e., cause of the failure, in the Kokomo tank and the Seegers tank were identical. He testified that the reason both tanks collapsed was because of an overstressing of the tank walls. He also testified that A283 C steel is a steel that "certainly should not be used in this type of structure" because it is subject to brittle failure and it will not redistribute stress properly. He testified that "it fails suddenly."

Walters also testified that a representation that A283 C steel is popular for tank steel "would be totally erroneous." He said "it is a brittle steel and it is definitely not the type of steel that should be used for a semifluid material," such as grain. He testified that cold temperatures put A283 C steel "into the brittle fracture mode of failure." Walters also stated that A283 C steel was not the right type of steel to be used for fabricating the Seegers tank or the Kokomo tank because "of its brittle characteristics and its physical properties." In addition, he stated that U.S. Steel should have known of the detrimental physical characteristics of A283 C steel when it was produced and sold by U.S. Steel.

According to Walters, a sudden decrease in temperature may have triggered the brittle fractures. He testified that when the temperature drops, the steel wall of the tank contracts and pushes against the grain, which is a semifluid material. The force required to push against the grain is higher than the static pressure of the grain without temperature change, thus increasing the stress in the wall when

there is a decrease in temperature. Moreover, Walters testified that "the character of the steel" was not the only cause of the failure of the tanks. He testified that the "failure to warn of the condition of the steel" was also a "cause of the failure" of the tanks. The testimony of a chemical engineer and metallurgist, Nathan A. Tiner, comports with the testimony of Walters.

The facts which we have discussed bear heavily in determining whether the trial court's rulings on the negligence count were proper. When these and other facts are compared with the applicable law, it is clear that the trial court erred.

■■■ ■ Necessary to any recovery based on the theory of common law negligence is the existence of a duty or an obligation requiring one to conform to a certain standard of conduct for the protection of another against an unreasonable risk. Whether under the facts of a case such a relationship exists between two parties as to require that a legal obligation be imposed upon one for the benefit of another is a question of law to be determined by the court. (*Barnes v. Washington* (1973), 56 Ill. 2d 22, 26, 305 N.E.2d 535, 538.) Once such a relationship exists, however, a duty to warn arises where there is unequal knowledge, actual or constructive, and the defendant, possessed of such knowledge, knows or should know that harm might or could occur if no warning is given. *Kirby v. General Paving Co.* (1967), 86 Ill. App. 2d 453, 457, 229 N.E.2d 777, 779.

Here, we are not dealing with a case where there was an over-the-counter sale of a generic product for use by an unknown consumer. Rather, this case involves a $111,390 sale of 282 tons of precisely measured steel plates, and U.S. Steel's own written order acknowledgment establishes that U.S. Steel knew that the steel plates were to be used to build a field-erected grain storage tank specifically for Seegers at a specified location. Under the circumstances, it is plain that a relationship existed between U.S. Steel and Seegers so that a legal obligation was imposed upon U.S. Steel to conform to a standard of conduct for the protection of Seegers against an unreasonable risk of the steel plates.

In addition, the record sufficiently establishes that after the Kokomo tank occurrence U.S. Steel was on notice that its steel plates should not be used for similarly constructed tanks in cold climates. Surely, other accidents occurring under similar conditions are not only admissible to prove the probability that a defendant had notice of the existence of a dangerous condition (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §401.15, at 160 (5th ed. 1990)), but also to establish that coupled with that notice and knowledge the defend-

ant had a duty to properly warn of that notice and knowledge. See *Rittenhouse v. Tabor Grain Co.* (1990), 203 Ill. App. 3d 639, 649, 561 N.E.2d 264, 271 ("evidence of the earlier collapse of the sister grain bin is relevant to explain the grain storage practices of both" defendants).

Moreover, the record sufficiently establishes that although U.S. Steel had knowledge of the Kokomo tank occurrence and the demonstrated danger inherent in using its steel plates to construct field-erected grain storage tanks in cold climates, Seegers had no such knowledge. Thus, it is plain that there was unequal knowledge between U.S. Steel and Seegers as to the danger demonstrated by the Kokomo occurrence. Possessed of such unequal knowledge, U.S. Steel knew or should have known of the danger awaiting Seegers unless U.S. Steel warned Seegers.

The thrust of U.S. Steel's argument is that because KCM had the same knowledge as U.S. Steel, it had no duty to warn Seegers of the danger inherent in its steel plates as demonstrated by the Kokomo occurrence. U.S. Steel's argument is unavailing because under the circumstances of this case, it was U.S. Steel's own relationship with Seegers that imposed a legal obligation to conform to a standard of conduct for the protection of Seegers against an unreasonable risk of the steel plates. The fact that KCM may also have had such a relationship and legal obligation does not nullify U.S. Steel's legal obligation to Seegers.

■■■ It follows that the trial court erred in ruling that as a matter of law U.S. Steel had no duty to warn Seegers of the possible "catastrophic fracture of its tank" because the steel was too brittle, "when defendant knew or should have known of other such failure of similar tanks constructed utilizing A283C steel prior to January 10, 1978, including the one at Kokomo, Indiana." Also, the trial court erred in ruling as a matter of law that U.S. Steel had no duty to inform Seegers of the results of "impact testing conducted upon the steel from the Kokomo, Indiana tank." The trial court also erred in striking those allegations from the negligence count. It is manifest that the trial court's rulings denied Seegers a fair trial on the negligence count. Seegers is therefore entitled to a new trial on the negligence count.

Accordingly, the directed verdict in favor of U.S. Steel on the product liability count is reversed; the verdicts and judgment on the breach of implied warranty counts are vacated, and the breach of implied warranty counts are stricken and dismissed as a matter of law; and the trial court's rulings on the negligence count are reversed and

the verdict and judgment on the negligence count are vacated. The case is remanded for a new trial on the product liability and negligence counts.

Reversed and remanded.

CERDA, P.J., and WHITE,* J., concur.

---

*Justice White participated and concurred in this opinion prior to his retirement.