UNITED STATES of America, et al.,
Plaintiffs-Appellees,

v.

GEOPHYSICAL CORPORATION OF
ALASKA, et al., Defendants-Appel-
lants-Cross-Appellees.

"THE BEAUFORT SEA" Limited
Partnership,
Plaintiff-Appellant-Cross-Appellee,

v.

UNITED STATES of America, et al.,
Defendants-Appellees-Cross-Appellants.

Nos. 82–3574, 82–3631.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 5, 1983.

Decided May 2, 1984.

As Amended on Denial of Rehearing
and Rehearing En Banc
Aug. 7, 1984.

James C. Kilbourne, Martin Green, Anne S. Almy, Dept. of Justice, Washington, D.C., for plaintiffs-appellees.

Joseph R.D. Loescher, Carl J.D. Bauman, Hughes, Thorsness, Gantz, Powell & Brundin, Robert A. Mintz, Anchorage, Alaska, for defendants-appellants-cross-appellees.

Before BROWNING, Chief Judge, HUG, and TANG, Circuit Judges.

HUG, Circuit Judge:

The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–1356, authorizes the Secretary of the Interior to issue permits for the geophysical and geological exploration of the outer continental shelf. Regulations promulgated pursuant to OCSLA impose conditions upon permittees, including the release to the Secretary of data and processed information [1] gathered under the permits and the public disclosure of that data and processed information. These appeals concern permittees' challenges to this regulatory scheme and the authorizing statutes. We hold that the permits, regulations, and statutes are valid.

---

**1.** As the permittees define these terms, "Raw geophysical or geological data" is data in the form it is acquired during exploration on the outer continental shelf. The geophysical exploration conducted under the permits in issue used a ship on the high seas with equipment to generate and record sound waves. The geological exploration differed in that samples from the seabed were collected. Normally, after the exploration is completed, the raw data obtained will be taken ashore and sent to a third party in the business of using computers and other technology to "process" the raw data. The product of that initial processing is then marketed to oil companies and other interested entities.

# I
## BACKGROUND

### A. Factual History

The Secretary is authorized to issue permits for geological and geophysical exploration under 43 U.S.C. § 1340(a)(1). Exploration is permitted as long as it does "not interfere with or endanger actual operations under any lease" and is "not unduly harmful to aquatic life." *Id.* The permits issued under this provision authorized exploration in a designated geographical area for a limited term. Each permit incorporated the provisions of 30 C.F.R. Part 251, which regulates exploration of the outer continental shelf. In addition, each permit provided that the Secretary would have the right to inspect all data gathered under the permit and all information processed from that data. On the Secretary's request, the permittee was required to release to the Government copies of any data and processed information. Although the cost of processing the copies released to the Secretary was reimbursable, neither the cost of gathering the data nor the market value of the data or processed information was to be refunded to the permittee. Each permit further provided that after a specific time period, all data and processed information released to the Secretary would be subject to public disclosure. Finally, the permittees agreed to comply with "other applicable regulations and statutes whether such statutes [and] regulations ... are enacted, promulgated, issued or amended before or after this Permit and Agreement is issued ...."

In 1976 and 1977, Geophysical Corporation of Alaska ("GCA") obtained three permits authorizing exploration of the outer continental shelf off the coast of Alaska. As to one of those permits, number 77–3, GCA entered into a limited partnership, The Beaufort Sea, for the purpose of acquiring and marketing geophysical data. GCA served as general partner and eleven individuals were limited partners. In 1977 and 1978, the Secretary requested release of data gathered under GCA's three permits. GCA refused to submit the requested information.

Nekton, Inc. held three permits for exploration off the Alaska coast and two permits for exploration off the California coast. These were issued during the period 1975–1977. The Secretary requested release of data gathered under at least two of these permits. Nekton released the requested data. No requests were made as to Nekton's remaining permits.

Norpac, Inc. obtained four permits in 1977. Each authorized exploration off the California coast. The Secretary has not requested the release of data gathered under any Norpac permit.

### B. Procedural History

In 1978, GCA brought an action against the Secretary seeking a declaratory judgment that the permit provisions and regulations requiring release and disclosure of data were invalid. It contended the regulations were not supported by statutory authority. It also argued that the regulations effected a taking of GCA's property without compensation in violation of the fifth amendment. The district court granted judgment to the Secretary on each of these claims. *Geophysical Corporation of Alaska v. Andrus,* 453 F.Supp. 361 (D.Alaska 1978). GCA did not appeal that judgment.

Despite the result of its declaratory judgment action, GCA did not release the data requested by the Secretary. The Secretary therefore filed an action in 1981 seeking an order requiring GCA to release data gathered under all three GCA permits. In response, GCA contended the Secretary had failed to name indispensable parties—The Beaufort Sea and its limited partners. This claim was based on the partners' asserted property interest in data gathered under permit number 77–3. The Secretary amended his complaint to name as defendants the eleven limited partners and The Beaufort Sea.

The partners then filed a separate action against the Secretary. They sought a declaratory judgment that the regulations and permit provisions were invalid for lack

of statutory authorization. They also contended that the regulations were improperly promulgated, that they effected an uncompensated taking in violation of the fifth amendment, and that they violated the Trade Secrets Act, 18 U.S.C. § 1905, and the Freedom of Information Act, 5 U.S.C. § 552(b)(4). Nekton and Norpac joined this suit as plaintiffs.

The district court consolidated the two cases and heard cross-motions for summary judgment. It held that the doctrine of collateral estoppel barred The Beaufort Sea and the partners, as privies of GCA, from raising the issues decided in *GCA v. Andrus*. It concluded Norpac and Nekton were not precluded from contending the regulations lacked statutory authorization or effected an unconstitutional taking, but it rejected both these claims on the basis of its prior decision. It found the Secretary had substantially complied with the Administrative Procedures Act and that the challenged regulations thus had not been improperly promulgated. Finally, it held that the permit provisions authorizing public disclosure of data were in conflict with the Trade Secrets Act and were therefore void. The resulting order required the permittees to release data and processed information, but prevented its public disclosure.

The Beaufort Sea and the partners appeal the grant of summary judgment to the Secretary. The Secretary cross-appeals, challenging the conclusion that the public disclosure provisions are void.

## II

### COLLATERAL ESTOPPEL

The Beaufort Sea and the limited partners contend the district court erred in applying the doctrine of collateral estoppel to certain of their claims. They contest the conclusion that they were in privity with GCA, asserting their interests in the data gathered under permit number 77–3 are distinct from GCA's because they derive from the partnership agreement.

▮ Whether collateral estoppel is available as a bar to these parties' claims is a mixed question of law and fact in which legal issues predominate. The question of the availability of the doctrine is thus subject to de novo review. *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir. 1984) (en banc). Once it is determined that the collateral estoppel bar is available, the actual decision to apply the doctrine is left to the district court's discretion. *In re Gottheiner*, 703 F.2d 1136, 1139 (9th Cir.1983).

▮ Under the doctrine of collateral estoppel, once a court in a prior action has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a different cause of action involving a party to the prior case. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). "Party" need not be defined in a rigid manner in this context. *United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir.1980); *Jackson v. Hayakawa*, 605 F.2d 1121, 1126 (9th Cir.1979), *cert. denied*, 445 U.S. 952, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). A person technically not a party to the prior action may be bound by the prior decision if his interests are so similar to a party's that that party was his "virtual representative" in the prior action. *ITT Rayonier*, 627 F.2d at 1003. *See also Aerojet-General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.), *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975); 18 Wright & Miller, *Federal Practice* § 4457 (1981). A finding of virtual representation may be based on an express or implied legal relationship that makes a party to the prior action accountable to a non-party. *ITT Rayonier*, 627 F.2d at 1003.

▮ In this case, the partnership provides a legal relationship upon which a finding of virtual representation can be based. The partnership's sole purpose was the collection and marketing of data under permit number 77–3. The limited partners' only claim to partnership profits derived from the sales of that data. GCA brought the prior action to protect the ownership and market value of the data. In doing so,

it not only acted in its own interest, but also protected the interests of The Beaufort Sea and the limited partners, some of whom were officers in GCA. The interests of GCA, the partnership, and the partners are so closely related that The Beaufort Sea and the partners are bound by the district court's decision in the prior action. Those parties are therefore precluded from claiming that the regulations lack statutory authorization or that they effect an unconstitutional taking.

### III

### MOOTNESS AND RIPENESS

The permit provisions and regulations challenged here impose time limitations on the Secretary's request for release of data and on the data's availability for disclosure. These facts thus present the question whether the permittees' claims are suitable for review at this time. We requested that the parties file supplemental briefing to aid us in resolving this issue. *See Canez v. Guerrero,* 707 F.2d 443, 446 (9th Cir.1983).

■ A claim is moot if it has lost its character as a present, live controversy. *Connolly v. Pension Benefit Guaranty Corp.,* 673 F.2d 1110, 1113 (9th Cir.1982). We cannot take jurisdiction over a claim as to which no effective relief can be granted. *Oregon Environmental Council v. Kunzman,* 714 F.2d 901, 903 (9th Cir.1983); *Bumpus v. Clark,* 702 F.2d 826, 827 (9th Cir.1983). Norpac's claims are of this character. It held four permits, each of which permitted exploration during 1977. The permits required Norpac to provide the Secretary immediate notice that it had acquired or processed data under the permit. The Secretary then had five years from receipt of the notice to request inspection and release of the data. No such request was made as to any Norpac permit and the Secretary now concedes he is precluded from making such a request. Any claim Norpac may have raised as to release and

disclosure of data gathered under its four permits is therefore moot.

[9] Of the five permits held by Nekton, at least two were the subject of timely requests by the Secretary for release of data. Nekton's challenges to the Secretary's requests give rise to a present controversy on which a grant of relief could be based. These claims thus are not moot.

Nekton also has asserted challenges to the eventual public disclosure of its data. The information in question was released to the Secretary in 1976 and 1977. Because the permit provisions authorize disclosure of data no sooner than ten years after its release, disclosure of Nekton's data could not occur prior to 1986. We must therefore consider whether our review of the challenges to the disclosure provisions would be premature.[2]

■ To determine if a claim is ripe for adjudication, we assess the appropriateness of the issue for judicial resolution and the hardship that will result from the denial of relief at this time. *Kerr-McGee Chemical Corp. v. U.S. Dept. of Interior,* 709 F.2d 597, 600 (9th Cir.1983); *Louisiana-Pacific Corp. v. Block,* 694 F.2d 1205, 1211 (9th Cir.1982). We also consider whether further factual inquiry will make the legal issues raised here more concrete. *Friedman Bros. Inv. Co. v. Lewis,* 676 F.2d 1317, 1319 (9th Cir.1982). Applying these principles, we conclude that Nekton's challenges to the disclosure provisions are ripe.

■ The disclosure provisions are part of a unified regulatory scheme. Review of the release requirements would not be meaningful if it excluded reference to the Secretary's eventual disposition of the data. Moreover, no factual questions pertinent to the disclosure provisions remain unresolved. We accept Nekton's representation that postponing review of this question would impose a substantial hardship

---

2. GCA, as cross-appellee, also contends the disclosure provisions are invalid. Because GCA has not yet released any data to the Secretary, the threat of public disclosure is somewhat

more remote than in Nekton's case. Our review of Nekton's claim makes it unnecessary to decide if the issue is ripe as to GCA.

on the company. The unresolved question may affect Nekton's administration of its present permits and application for future ones. Review of the disclosure provision thus is not premature.

## IV

## STATUTORY AUTHORIZATION FOR REGULATIONS

At the time Nekton obtained its permits, 30 C.F.R. § 251.12(b)(2) provided in part:

> The Supervisor shall have the right to inspect the geophysical data, processed geophysical information, or reprocessed geophysical information prior to selection in writing.... At any time prior to selection in writing, the Supervisor shall have the right to return, without cost to the Government except for reproduction costs, any or all geophysical data, processed geophysical information, or reprocessed geophysical information following either inspection and detailed assessment of quality or establishment of price to the Government for processing or reprocessing. If the Supervisor decides to keep any or all of the geophysical data, processed geophysical information, or reprocessed geophysical information, he shall select them in writing; and if they are on the permittee's premises, the permittee shall submit them within 30 days after receiving a request for submission of them.

Nekton contends there was no statutory authorization for the promulgation of this regulation. It notes that at the time its permits were issued, the only provision of OCSLA that regulated exploratory activities was 43 U.S.C. § 1340 (1953) (amended 1978). That section provided:

> Any agency of the United States and any person authorized by the Secretary may conduct geological and geophysical explorations in the outer Continental Shelf, which do not interfere with or endanger actual operations under any lease maintained or granted pursuant to

this subchapter, and which are not unduly harmful to aquatic life in such area.

Nekton argues the statute permitted the Secretary to impose only two conditions on exploration—prohibition of interference with lease activity or with aquatic life. It infers the Secretary was not authorized to impose any additional conditions on permittees.

We need not determine what authority was delegated to the Secretary by the original version of section 1340. In obtaining each of its permits, Nekton agreed to be bound by all applicable statutes, including those "enacted, promulgated, issued or amended before or after this Permit and Agreement is issued...." In 1978, OCSLA was amended to add section 1352. Subpart (a)(1)(A) of that statute expressly authorizes the promulgation of the challenged regulation:

> Any lessee or permittee conducting any exploration for, or development or production of, oil or gas pursuant to this subchapter shall provide the Secretary access to all data and information (including processed, analyzed, and interpreted information) obtained from such activity and shall provide copies of such data and information as the Secretary may request. Such data and information shall be provided in accordance with regulations which the Secretary shall prescribe.

We reject Nekton's contention that it should not be bound by this amendment because Congress did not indicate it was to have retroactive effect. In contracting for its permits, Nekton agreed to be bound by changes in law. That obligation was not conditioned upon congressional intent to require retroactive application of the amendment. The release regulation and permit provisions, as authorized by section 1352, are therefore valid.[3]

## V

## UNCONSTITUTIONAL TAKING

Nekton argues that by requiring release of data and processed information

---

**3.** The permittees' challenge to the promulgation of the regulations asserted a failure to indicate the proper statutory authority for the 1976 regulations. Because we conclude the 1978 amendments validated the permit provisions, we need not review the promulgation claim.

without providing compensation for the permittees' exploration costs and the data's market value, the regulation and permit provisions effect a taking in violation of the fifth amendment. It contends that requiring permittees to agree to this uncompensated taking constitutes imposition of an unconstitutional condition. Nekton bases its claim on *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), and on other Supreme Court cases that prohibit the imposition of unconstitutional conditions. The district court determined that line of cases to be inapplicable in view of our decision in *Portland General Electric Co. v. Federal Power Comm.,* 328 F.2d 165 (9th Cir.1964). In *Portland General,* we held that:

> It is not a taking for the Government to withhold a benefit it is not contractually or constitutionally obliged to confer. Nor is it a taking for the Government to impose financial obligations upon the recipient of a benefit if, as here, the benefit may be declined.

*Id.* at 173.

 We recently had occasion to reconcile *Portland General* with the *Perry* line of cases. In *Parks v. Watson,* 716 F.2d 646, 650 (9th Cir.1983) (per curiam), we stated the general rule that "the government may not impose a choice between the government benefit and the exercise of a constitutionally guaranteed right." In order to determine if requiring such a choice is permissible, it is necessary to focus upon the propriety of the condition imposed. *Id.* at 651. If the condition is rationally related to the benefit conferred, its imposition does not coerce the recipient to forgo constitutional rights. *Id.* at 652–53. This rational relation requirement prevents the government from using its greater bargaining strength to compel acquiescence in a matter not related to the parties' bargain. *Id.* at 652 n. 3.

We applied this analysis to the *Portland General* facts and noted that the conditions imposed upon the utility's license application were not unconstitutional because they were "directly related to the subject of the requested license, navigational rights." *Id.* at 650. Another of this court's cases on unconstitutional conditions, *Honolulu Rapid Transit Co. v. Dolim,* 459 F.2d 551 (9th Cir.), *cert. denied,* 409 U.S. 875, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972), was also analyzed in *Parks.* As in *Portland General,* in *Honolulu* the franchise applicant was subjected to a condition directly related to the subject of the application, public transportation. *Parks,* 716 F.2d at 651. In contrast, the condition imposed on the *Parks* plaintiffs had no rational relationship to any public purpose relevant to their application. We therefore held that the condition violated the fifth amendment.

In the instant case, the condition imposed is release to the Secretary of geophysical data and processed information. Unquestionably this condition is rationally related to the benefit sought by Nekton—permission to explore the outer continental shelf. The overall purpose of OCSLA was to allow for the orderly and productive development of energy resources. H.R.Rep. No. 590, 95th Cong., 2d Sess. 122, *reprinted in* 1978 U.S.Code Cong. & Ad.News 1450, 1528. The compilation of data by the Secretary is an intrinsic part of this overall plan. It provides information necessary to the administration of leasing programs. The condition imposed on the permittees therefore does not constitute an uncompensated taking of Nekton's property.

## VI

## TRADE PRACTICES ACT

Nekton, the partners, and the partnership question the validity of 30 C.F.R. § 251.14–1(c), which requires the Secretary to disclose to the public all data and processed information released by the permittees. The permittees claim this regulation violates the Freedom of Information Act, 5 U.S.C. § 552(b)(4), and the Trade Secrets Act, 18 U.S.C. § 1905. The district court granted summary judgment to the permittees on this claim, concluding that the disclosure provisions of the permits were void

because they violated the Trade Secrets Act.

We must consider first GCA's contention that the Secretary's appeal of this portion of the judgment was untimely. The district court issued a final judgment on September 1, 1982. The permittees requested a modification of that judgment to clarify that the disposition of their constitutional claim was a denial of summary judgment. In response, the court filed an amended judgment on September 13. The Secretary's notice of appeal, filed November 9, was submitted within 60 days of the entry of the amended final judgment. GCA argues that the appeal period ran from the September 1 judgment, since the September 13 amendment was merely a technical modification that affected no party's rights. Because the Secretary's notice of appeal was filed more than 60 days after September 1, GCA views it as untimely.

When a Fed.R.Civ.P. Rule 59 motion to alter or amend the judgment is filed, the appeal period may be delayed until the entry of an order granting or denying that motion. Fed.R.App.P. 4(a)(4). However, not all Rule 59 motions have that effect. If the later judgment is entered merely to correct a "true clerical error," the date of judgment is not affected. *County of Imperial v. United States*, 348 F.2d 904, 905 (9th Cir.1965) (per curiam) (change of date from March 8 to March 1). Where the amendment is a "material change" that affects the parties' rights or the decision to appeal, the judgment on the motion to amend does initiate a new appeal period. *Id.* (addition of parcel description to judgment of foreclosure).

The amendment here was more than correction of a "true clerical error." The permittees sought the amendment on the basis that the judgment as written left unadjudicated their claim that the 1978 amendments to OCSLA and the regulations promulgated pursuant to those amendments effected an unconstitutional taking. The September 1, 1982 judgment adjudicated only the claim that the 1976 regulations violated the Constitution. Although it purported to be a final judgment, it left unresolved one of the permittees' claims. The permittees were thus prevented from appealing that judgment by Fed.R.Civ.P. 54(b). The amended judgment entered on September 13 made clear the district court's intention to dispose of all of the permittees' claims and established the permittees' right to appeal. It was thus a material modification that triggered the running of the appeal period, and the Secretary's cross-appeal was timely filed.

Neither of the statutes relied on by the permittees—5 U.S.C. § 552 or 18 U.S.C. § 1905—provides a private right of action to enjoin agency disclosures. *Chrysler Corp. v. Brown*, 441 U.S. 281, 294, 316, 99 S.Ct. 1705, 1713, 1725, 60 L.Ed.2d 208 (1979). However, in essence, the permittees asserted a claim that disclosure could not comply with 18 U.S.C. § 1905. The issue may therefore be reviewed under 5 U.S.C. § 706 as a claim that disclosure would constitute agency action not in accordance with law. *Id.* at 318, 99 S.Ct. at 1726; *see* 5 U.S.C. § 706(2)(A).

18 U.S.C. § 1905 provides in part:

Whoever, being an officer or employee of the United States ... publishes, divulges, discloses, or makes known in any manner or to any extent *not authorized by law* any information coming to him in the course of his employment ..., which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association ... shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment.

(Emphasis added.)

The focus of the dispute here is whether the regulations and permit provisions regarding disclosure are "authorized by

law."[4] Disclosure is authorized if it is "reasonably within the contemplation" of the grant of legislative authority. *Chrysler*, 441 U.S. at 306, 99 S.Ct. at 1720.

■ At the time these permits were issued, OCSLA made no reference to public disclosure of data and processed information. In the 1978 amendments to the Act, Congress included section 1352(c), which provides in part:

> The Secretary shall prescribe regulations to (1) assure that the confidentiality of privileged or proprietary information received by the Secretary under this section will be maintained, and (2) set forth the time periods and conditions which shall be applicable to the release of such information. . . .

Pursuant to this section, the Secretary promulgated 30 C.F.R. § 251.14 (1980), requiring public disclosure of data ten years after issuance of the permit and of processed information ten years after its release. We believe subsection 2 of section 1352(c) contemplated the disclosure scheme designed by the Secretary. The use of the term "release" and the requirement that the information be held in confidence pending release support this conclusion. In addition, the scheme is consistent with OCSLA's overall purpose. The permittees offer no alternate interpretation of the statutory language.

The permittees contend section 1352(c) did not authorize the regulation and permit provisions for two reasons. First, they contend the section was not intended to have application to permits issued prior to its enactment. We reject this argument for the reasons stated in Section IV of this opinion.

Second, the permittees contend the language of their permits precludes any change in the disclosure provision. The permit section obligating the permittees to comply with changes in the law concludes as follows:

*provided, however,* that if any provision of any future statute, regulation or order is in conflict with the terms of sections 5 or 6 hereof [regulating reimbursement and disclosure], the terms of those sections shall control.

A subsequent permit section allows the government to amend any provision of the permit at any time, with the exceptions of sections 5 and 6. In the permittees' view, these provisions signify that the disclosure provision is "inviolate and not subject to modification or amendment." From this conclusion they reason the disclosure provision is invalid.

■ We disagree. This permit language does not provide that conflicting changes in the law void the disclosure provision. It merely states that where a conflict exists, the permit language controls. There is no conflict here as to the permissibility of disclosure. The permittees agreed to have the data disclosed and the 1978 amendments to OCSLA validated that agreement. The only apparent conflict goes to the time at which disclosure must occur. 30 C.F.R. § 251.14 requires disclosure of certain data ten years after issuance of the permit, a shorter period than that contemplated by the language in some of the permits. As to that conflict, the permit language controls the date on which disclosure must occur.

To summarize, the permit provisions requiring public disclosure of data and processed information are valid under 43 U.S.C. § 1352(c). The language of each permit, rather than 30 C.F.R. § 251.14, determines the date of disclosure of material gathered under the permit.

## VII

### CONCLUSION

The summary judgment granted the Secretary in No. 82–3574 is AFFIRMED. The summary judgment granted the permittees in No. 82–3531 is REVERSED and the

---

**4.** The Secretary contends that the data and processed information are not "trade secrets" for purposes of 18 U.S.C. § 1905. We assume without deciding that the Act does govern this material.

cause is REMANDED to the district court for issuance of an order consistent with this opinion. Each party shall bear its own costs on appeal.