Ole NYGAARD, Timothy and Katrina Nichols, James and Brenda Kelley, Phyllis White, Joseph Eason, Jr., and Richard Armstrong, Plaintiffs,

v.

UNITED PARCEL SERVICE GENERAL SERVICES CO., a Delaware corporation; Inforite Corp., a New York corporation; Toppan Moore Co., a Japanese corporation; and II Morrow, Inc., an Oregon corporation, Defendants.

Civil No. 96–824–FR.

United States District Court,
D. Oregon.

April 3, 1998.

---

Arthur C. Johnson, Johnson, Clifton, Larson & Corson, Eugene, OR, William Rutzick, Corrie J. Yackulic, Schroeter, Goldmark & Bender, Seattle, WA, David N. Mark, Seattle, WA, for Plaintiffs.

Christopher W. Angius, Joy Ellis, Perkins Coie, Portland, OR, G.H. Gromel, Jr., Cassandra C. Collins, Hunton & Williams, Richmond, VA, Anne E. Kershaw, Hunton & Williams, New York City, for Defendants United Parcel Service General Services Co. and II Morrow, Inc.

Richard A. Lee, Molly Jo Mullen, Bodyfelt, Mount, Stroup & Chamberlain, Portland, OR, for Defendant Inforite Corp.

James D. Hibbard, John T. Kaempf, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, OR, for Defendant Toppan Moore Co.

## OPINION

FRYE, District Judge.

The plaintiffs, package car drivers employed by United Parcel Service, allege that they have suffered repetitive stress injuries from using hand-held computers known as delivery information acquisition devices (DIADs) in the performance of their jobs. Before the court is the motion of defendant Inforite Corp. for summary judgment (# 54); the motion of defendant Toppan Moore Co., Ltd. for summary judgment (# 53); the motion of defendants United Parcel Service General Services Co. and II Morrow, Inc. for summary judgment (# 55); and the motion of defendant Toppan Moore to join defendant Inforite Corp.'s motion for summary judgment (# 58).

## UNDISPUTED FACTS

### 1. UPS Corporate Structure

The package delivery business that is commonly called "UPS" is a family of corporations. UPS America, Inc. (UPS America) is the parent corporation of numerous wholly-owned subsidiaries, including defendant United Parcel Service General Services Co. (UPSGSC); defendant II Morrow, Inc.; United Parcel Service, Inc., an Ohio corporation and United Parcel Service, Inc., a New York corporation (collectively, UPS, Inc.). The plaintiffs are package car drivers employed by UPS, Inc., the entity which is responsible for the ground delivery of packages. UPS New York employs package car drivers who service other parts of the country. UPSGSC and UPS, Inc. share the same corporate chairman, secretary, assistant secretary, treasurer, assistant treasurer, and directors, and they share fifteen of the same vice presidents. UPS America files a consolidated federal income tax return for itself and its subsidiaries located in the United States, including II Morrow, Inc., UPS, Inc., and UPSGSC.

Effective January 1, 1958, UPSGSC entered into a contract with UPS America, whereby UPSGSC agreed to provide administrative and management services for numerous operating companies, including UPS, Inc. (the Service Agreement). One of the services specified in the Service Agreement for UPSGSC to perform was "[t]o assist each of said operating companies in accident prevention and safety work." UPSGSC also agreed to supervise "the purchase of insurance of every kind and character." The Service Agreement provides that "[y]our company [UPSGSC] will be required to perform the services described above as items (1) to (5) [including the two noted above by the court]." The Service Agreement was modified in 1970 to provide that "the fee shall be equal to five (5%) per cent of your [UPSGSC's] actual disbursements for labor, materials and expenses required or incurred by you [UPSGSC] in the performance of said agreement." UPSGSC also purchases material and equipment, including trucks, uniforms, and hand held equipment, on behalf of the operating companies, including UPS, Inc. These purchases are transferred to the operating companies at cost through an intercompany clearing account.

As stated above, the Service Agreement requires UPSGSC to purchase insurance of every kind and character for the operating companies, including UPS, Inc. James Felty of UPSGSC testified as follows:

> Q. And how about workers' compensation coverage, who's the carrier for that?

A. Liberty Mutual Insurance Company.

Q. And who pays for the premium on that?

A. General Services Company.

Q. And do the operating companies have workers' compensation coverage?

A. Yes, they do.

Q. And who's the carrier for that?

A. Liberty Mutual Insurance Company.

Q. Who pays the premium on that?

A. General Services Company.

. . . .

Q. [by a different attorney] Does General Services Company have its own workers' compensation policy?

A. General Services is covered I believe under a blanket policy that covers all the companies. I can't speak to that specifically, though.

Q. So you don't know whether or not General Services workers' comp policy for its own employees is different or the same as the policy that the operating companies have for its own employees?

A. I have no intimate knowledge of independent individual insurance policies. That's not what I do.

Deposition of James Felty at 112–13. The plaintiffs obtained a declaration from Donna Knepper, an employee of the State of Wisconsin. She states that no entity called United Parcel Service General Services Company is identified as an "employer" or is listed as having workers' compensation insurance coverage in the State of Wisconsin. Knepper included several pages of printouts of the information that the State of Wisconsin has concerning entities related to UPS. Most pages of the printouts list UPS of America as the insured; UPS, Inc. is mentioned in only one place.

UPSGSC and UPS, Inc. keep separate books. The general tariff [1] is issued by UPS, Inc. and UPS New York. The National Master United Parcel Service Agreement is a collective bargaining agreement between the International Brotherhood of Teamsters and UPS, Inc. and UPS New York.

The service territory is divided into regions. UPSGSC employs people working at the regional level. Regions are divided into districts. Operating companies, including UPS, Inc., employ people working at the district level. District managers report to regional managers. At the district level, supervisors of UPS, Inc. hire the package car drivers, train them, evaluate them, and manage their daily concerns, such as the assignment of their routes and any grievances that they have.

2. *The Engineering Projects*

In 1984, Clay Lafferty, the head of research and development for defendant UPSGSC, sent a Request for Proposal to several companies asking for proposals "to design, build, and test five prototypes of a hand-held delivery information acquisition device" (DIAD). Affidavit of Richard A. Lee, Exhibit A at 6. In February of 1986, UPSGSC contracted with defendant Inforite Corp. (Inforite) to design, build and test the prototype DIADs.

Inforite did not have a technical design engineering group; therefore, the engineering work necessary for the DIADs was to be performed by employees of the parent company of Inforite, defendant Toppan Moore Co. (Toppan Moore). Inforite is located in the United States; Toppan Moore is located in Japan. Lafferty frequently met with engineers from Toppan Moore in Japan. Inforite sent representatives to some, but not all, of these meetings.

Toppan Moore built 50 prototype DIADs and sent them to UPSGSC in late 1987 and early 1988. UPSGSC's engineers tested the prototypes, rewrote the software, and began field testing the prototypes in the State of New York. Changes were made to the DIADs after the field tests. In November of 1988, UPSGSC ordered the manufacture of an additional 250 prototype DIADs; they were delivered in April of 1989, and field testing continued.

---

**1.** A document describing the services offered by a common carrier.

UPSGSC and Inforite entered into a contract effective September 28, 1989 whereby Inforite agreed to manufacture and supply DIADs to UPSGSC. Section 15.5 of that agreement states that nothing contained in the agreement creates a joint venture or a partnership between the companies.

Robert Esslinger, an employee of UPSGSC, states that Inforite did not design or engineer the DIADs, "not one stroke." Affidavit of Richard A. Lee, Exhibit C at 5. Roy Lancraft from the research and development department of UPSGSC also states that Inforite did not do any design work on the DIADs. Kiroku Kato of Inforite states that, at the relevant time, Inforite did not have any design engineers on its staff. Kato was at some of the meetings where employees of UPSGSC and of Toppan Moore discussed the design of the DIADs. Lafferty states that he and people at Inforite and Toppan Moore came to a "joint conclusion" that the DIADs should be shaped like a clipboard because the decision came out of a meeting where they were all getting together and going over the requirements. Declaration of Corrie J. Yackulic, Exhibit 5 at 134–35.

Kato of Inforite prepared the 1984 proposal in response to the request of UPSGSC and also prepared the 1986 addendum to the proposal. At least some of the decisions reflected in the proposal and its addendum, such as eliminating the shoulder strap from the design, were dictated to Kato by UPSGSC. Kato also testified that the substance of the proposal was "almost entirely" prepared by the Toppan Moore engineering group. Affidavit of Richard Lee, Exhibit I at 3. UPSGSC insisted that all of the communications between Toppan Moore and UPSGSC be routed through Inforite. Inforite took steps to reinforce the importance of this request with employees of Toppan Moore when Toppan Moore employees began to contact UPSGSC directly.

UPSGSC wrote the final product specifications in August of 1989 and contracted with Inforite to sell the DIADs to UPSGSC, which were manufactured according to the final product specifications written in August of 1989. This group of mass-produced DIADs were called DIAD IAs. The DIAD IAs were manufactured by Toppan Moore, who sold them to Inforite, who sold them to UPSGSC. During the manufacture, the sale, and the shipment of the DIAD IAs, Inforite never possessed them. The DIAD IAs passed directly from Toppan Moore to UPSGSC. Approximately 100,000 DIAD IAs were manufactured. Inforite wrote a service manual in 1990 and performed warranty repairs on the DIAD IAs without the aid of a subcontractor.

In 1990, defendant II Morrow, Inc. (II Morrow) formulated a concept for a smaller and lighter version of the DIAD. It became known as the DIAD II.

II Morrow formulated the concept for the DIAD Vehicle Adapter (DVA) which attaches to the dashboard of a UPS package car. The DVA houses the DIAD when it is not in use and allows the DIAD to transmit delivery information to a central location using a cellular telephone modem. II Morrow designed the DVA I to be used with the DIAD IA. The company developed a working prototype by January of 1992. During 1992, UPSGSC contracted with Motorola to finish the design and to manufacture the DIAD II, and the DVA I. II Morrow developed the concept for the DVA II in connection with its preliminary design work on the DIAD II. Motorola completed the design and manufactured the DVA II.

In 1993, II Morrow modified the DIAD IA case. At the same time, Toppan Moore produced a new DIAD IA motherboard. When a DIAD IA is upgraded with the modified case and new motherboard, it is called a DIAD IA–1.

UPSGSC and II Morrow did not sell or market the DIAD or the DVA to the general public. They were only involved in the equipment to be used by the package car drivers of UPS, Inc.

The plaintiffs allege that they sustained injuries when they used the DIAD [2] during

---

**2.** If the specific model of the DIAD is not relevant, the court will use the term "DIAD" to refer generally to the equipment.

the course of their employment. They allege two claims for relief: (1) negligence in the design of the DIAD and in failing to instruct users on the proper use of the DIAD and in failing to warn of possible dangers; and (2) strict product liability based on the allegation that the DIAD is unreasonably dangerous and in failing to instruct users on the proper use of the DIAD and in failing to warn of the possible dangers of the DIAD.

## CONTENTIONS OF THE PARTIES

Toppan Moore contends that all of the claims of the plaintiffs are barred by the doctrine of issue preclusion because all of the issues in the present claims were litigated and resolved in their favor in a prior lawsuit, *Neher v. II Morrow, Inc.* (W.D.Wash., CV94–1613WD). Toppan Moore and Inforite contend that the contract specifications defense precludes them from liability for any of the plaintiffs' claims except the claims for the post-manufacture failure to warn because they manufactured the DIAD according to specifications provided by UPSGSC. Toppan Moore contends that it is not liable for the claims of the plaintiffs for post-manufacture failure to warn because they did not know of any complaints concerning the DIAD before *Neher* was filed.

The plaintiffs contend that (1) issue preclusion cannot be a defense against their claims because they were not represented in the prior litigation; (2) Toppan Moore engaged in a role too extensive for the application of the contract specifications defense, and that that defense is contrary to the laws of the State of Oregon and the home states of the plaintiffs; and (3) Toppan Moore knew of hazards associated with the DIAD prior to plaintiffs being injured and, thus, should have warned plaintiffs about the risks of using the device.

Toppan Moore and Inforite contend that the Distributor Statute of the State of Kentucky precludes the claim of strict product liability filed by plaintiff Timothy Nichols.

Plaintiff Timothy Nichols contends that both companies exercised significant control over the design of the DIAD, and that, consequently, the Distributor Statute of the

State of Kentucky does not apply to his claim of strict product liability.

UPSGSC and II Morrow contend that they did not market or place into the stream of commerce the DIAD or the DVA, and, consequently, they cannot be held strictly liable. UPSGSC contends that the claims of the plaintiffs against it are barred by the various workers' compensation laws of the home states of the plaintiffs. II Morrow contends that it owed no duty to the plaintiffs which would support a negligence claim. Both defendants contend that plaintiff Phyllis White's strict product liability claim is barred because the State of Virginia does not recognize that cause of action.

The plaintiffs contend that their claims against UPSGSC and II Morrow are not barred by the various workers' compensation laws of the home states of the plaintiffs because UPSGSC is not a joint employer with UPS, Inc. and because neither company is a stranger to the business of the plaintiffs' employer. The plaintiffs further contend that UPSGSC and II Morrow are both sellers of the DIAD and the DVA to other UPS corporate entities and therefore placed the products into the stream of commerce. The plaintiffs further contend that UPSGSC and II Morrow are liable because they knew that Inforite would market the DIAD as its own product, the AS 1050. The plaintiffs also argue that the involvement of II Morrow as the designer and manufacturer of the DIAD IA–1 is enough to give rise to a negligence cause of action against II Morrow. Plaintiff Phyllis White contends that the State of Virginia recognizes causes of action which are equivalent to strict product liability causes of action.

All defendants contend that plaintiff Phyllis White's claims are barred by the applicable statute of limitations.

Plaintiff Phyllis White contends that the limitations period was tolled while she had an action pending in the State of New York and that she suffered additional injuries within the limitations period.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material

fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987).

## ANALYSIS AND RULING

### 1. *Choice of Law*

The first question is whether the laws of the home states of the plaintiffs or the laws of the State of Oregon apply to the plaintiffs' claims. The parties all agree that the workers' compensation laws of the plaintiffs' home states apply to this action. The court will apply those laws.

When the laws of more than one jurisdiction arguably apply to an issue, a federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it is located. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

■ Under Oregon law, the court must determine whether there is an actual conflict of law on the disputed issue; if not, Oregon law applies. *Cropp v. Interstate Distrib. Co.*, 129 Or.App. 510, 515–16, 880 P.2d 464 (dissenting opinion), *rev. denied*, 320 Or. 407, 887 P.2d 791 (1994). Next, the court must determine whether both states have substantial interests in having their laws applied. If not, there is no choice of law issue, and the court applies the law of the one state with substantial interests. *Dabbs v. Silver Eagle Mfg. Co.*, 98 Or.App. 581, 583–84, 779 P.2d 1104, *rev. denied*, 308 Or. 608, 784 P.2d 1101 (1989). If both states have substantial interests, the Oregon Supreme Court has adopted the "most significant relationship" approach of the Restatement (Second) Conflicts of

Law. *Erwin v. Thomas*, 264 Or. 454, 456, 506 P.2d 494 (1973).

■ Concerning what the court will call product liability laws, the plaintiffs do not agree with UPSGSC or II Morrow that there is a difference between the laws of the State of Oregon and the laws of the plaintiffs' home states. Although some portion of those bodies of laws are not in conflict, the laws in the various states are not identical to the laws of the State of Oregon. For example, the State of Illinois has enacted a statute which limits the defendants against which a plaintiff may proceed with a strict product liability claim. The State of Oregon does not have a similar statute. In discussing a claim for common law negligence that arose in connection with a products liability action, the Illinois court held that a manufacturer has a continuing duty to warn of dangers in its product if it becomes aware of an accident after the sale takes place. *Seegers Grain Co. v. United States Steel Corp.*, 218 Ill.App.3d 357, 160 Ill.Dec. 793, 577 N.E.2d 1364, 1373–74 , *appeal denied*, 142 Ill.2d 665, 164 Ill.Dec. 928, 584 N.E.2d 140 (1991). The parties have not cited an Oregon case which applies the same law. The court finds that there is an actual conflict of law on the product liability claim.

The court also concludes that the State of Oregon has neither a substantial interest in having its product liability laws applied in this case, nor does it have the most significant relationship to the occurrence and the parties. The plaintiffs argue that the DIADs were used by hundreds of UPSGSC drivers in the State of Oregon, and that the defendants knew the DIADs would be used across the country. There may well have been numerous UPSGSC drivers in the State of Oregon who used the DIADs, but none of these drivers are before this court. None of the plaintiffs are residents of the State of Oregon, and there is no allegation that they were injured while working in the State of Oregon. Some of the defendants do not conduct business in the State of Oregon. The DIADs were not designed or manufactured in the State of Oregon. The court will apply the laws of the plaintiffs' home states to the product liability claim.

The parties agree that there is no conflict in the negligence laws to be applied. Thus, the court will apply the negligence laws of the State of Oregon to the negligence claims.

## 2. The Distributor Statute of the State of Kentucky

█ Product Liability Act of Kentucky contains the following limitation of liability:

In any product liability action, if the manufacturer is identified and subject to the jurisdiction of the court, a wholesaler, distributor, or retailer who distributes or sells a product, upon his showing by a preponderance of the evidence that said product was sold by him in its original manufactured condition or package, or in the same condition such product was in when received by said wholesaler, distributor or retailer, shall not be liable to the plaintiff for damages arising solely from the distribution or sale of such product, unless such wholesaler, distributor or retailer, breached an express warranty or knew or should have known at the time of distribution or sale of such product that the product was in a defective condition, unreasonably dangerous to the user or consumer.

KRS § 411.340.

Toppan Moore and Inforite contend that this provision protects them from liability. Toppan Moore, however, manufactured the DIAD IAs. Thus, as a manufacturer, § 411.340 clearly does not apply to Toppan Moore.

The record indicates that Inforite did not manufacture the DIAD and that the product was never in the possession of Inforite. Therefore, Inforite must have sold the DIAD in its original manufactured condition. The statute protects a distributor of a product from damages arising solely from the distribution of the product. The facts here are quite different, however. Inforite was involved during the entire multi-year design phase of the DIAD. The injuries here are allegedly the result of a defective design. Nichols has raised a genuine issue of material fact as to whether Inforite, through Kato's efforts, acted as a designer of the DIAD and not as a mere distributor. Moreover, in the

analysis below concerning the post-manufacture failure to warn claims, the court concludes that there is a factual issue as to whether Inforite should have known of the alleged dangers of the DIAD prior to 1990. This knowledge would preclude application of § 411.340. Accordingly, Inforite and Toppan Moore's motion for summary judgment against the strict product liability claim alleged by Nichols is denied.

## 3. Issue Preclusion

Toppan Moore and Inforite contend that the claims of all of the plaintiffs are barred by the doctrine of issue preclusion because the issues alleged here were fully litigated and resolved in its favor in *Neher v. II Morrow, Inc.* (W.D.Wash., CV94–1613WD). The plaintiffs contend that they are not bound by the judgment in *Neher* because they were not parties to that action and were not virtually represented by the *Neher* plaintiffs. The plaintiffs further contend that the defendants have not proven that the Product Liability Act of the State of Washington is the same as the product liability laws of the home states of the plaintiffs.

█ Issue preclusion, also known as collateral estoppel, bars the relitigation of issues actually adjudicated in previous litigation between the same parties. *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir.1992). For issue preclusion to apply:

(1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action.

*Id.* A final judgment may have *res judicata* effect, even during the pendency of an appeal. *Eichman v. Fotomat Corp.*, 759 F.2d 1434, 1439 (9th Cir.1985).

The plaintiffs do not contend that the issues were not actually litigated in *Neher* or that the determination of the issues in *Neher* was not a necessary part of the judgment.

█ Issue preclusion may also be applied against a party who is in privity with a

party in the prior litigation. *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 910 (9th Cir.1997). Likewise, issue preclusion will be applied if the current party's interests are so similar to the interest of a party in the prior litigation that the party in the prior litigation acted there as the virtual representative for the current party. *United States v. Geophysical Corp.*, 732 F.2d 693, 697 (9th Cir.1984). Virtual representation may be based on "an express or implied legal relationship that makes a party to the prior action accountable to a non-party." *Id.* For example, in *Geophysical*, a general partner and the limited partners were foreclosed from relitigating issues litigated by the limited partnership. *Id.*

The defendants argue here that the *Neher* plaintiffs are in privity with or are virtually represented by the plaintiffs here for the following reasons: (1) the plaintiffs in both actions are UPSGSC drivers or their spouses who are alleging the same claims of negligence and product liability against the same four defendants; and (2) the plaintiffs in both actions are represented by the same attorneys.

■ The defendants correctly point out that a legal relationship is not required for a finding of virtual representation in the Ninth Circuit as it is in some other jurisdictions. *See Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 177 (3rd Cir.1994) (applying New Jersey law). A legal relationship would bolster the defendants' argument, however. Here, there is no evidence of a legal relationship between the two sets of plaintiffs and no evidence of control by the present plaintiffs over the *Neher* plaintiffs. Courts have refused to apply issue preclusion even when a legal relationship and control exists. *See Conte v. Justice*, 996 F.2d 1398, 1402–03 (2nd Cir.1993) (in automobile accident litigation, a mother was not barred from litigating an action for her personal injuries after she controlled the litigation in a prior action as the guardian of her child).

■ The court concludes that sharing an attorney is insufficient for this court to rule that the plaintiffs here were virtually represented by the *Neher* plaintiffs. Although attorneys were shared, other courts have not

applied issue preclusion under the following circumstances: against a former employee alleging personal injury from silica exposure at work when 48 other former employees were unsuccessful in the prior litigation, *Collins*, 34 F.3d at 176–79; against two sets of petroleum company plaintiffs in antitrust litigation, *Benson and Ford, Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172 (5th Cir.1987). The relationship between the plaintiffs here is even more distant.

Four factors are considered in determining whether the issue before the court is identical to an issue previously litigated:

(1) is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?

(2) does the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding?

(3) could pretrial preparation and discovery related to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?

(4) how closely related are the claims involved in the two proceedings?

*Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir.1997).

The court has determined above that there are enough differences among the product liability laws of the various states that it will apply the laws of the plaintiffs' home states. It follows that the rule of law applied in *Neher* (Washington law) will not be applied here.

Because the plaintiffs' interests were not represented in *Neher*, and because the issues are not identical, the court will not apply the doctrine of issue preclusion to bar the claims against Toppan Moore and Inforite.

### 4. Contract Specifications Defense

■ Toppan Moore and Inforite contend that they manufactured the DIAD according to the specifications provided by UPSGSC, and, consequently, the contract specifications defense defeats all of the plaintiffs' claims

except the claim of failure to warn. The defendants further contend that the contract specifications defense may be applied even if they had some involvement in the design process as long as UPSGSC knew as much or more than they did about the alleged hazards of the product. The plaintiffs contend that the contract specifications defense has been adopted by only a few jurisdictions, which include none of the plaintiffs' home states, and that the contract specifications defense is inconsistent with the strict product liability laws, which have been adopted in the plaintiffs' home states.

Without deciding whether the contract specifications defense survives the enactment of strict product liability laws, or whether it would be applied in the home states of the plaintiffs, the court concludes that a jury could find that Toppan Moore and Inforite participated too much during the design phase of the DIAD project for the contract specifications defense to apply. In many of the cases cited by the defendants, the defendant manufacturer was supplied with a full specification that it built without change. *See, e.g., Garrison v. Rohm and Haas Co.,* 492 F.2d 346, 348 (6th Cir.1974) ("neither [the manufacturer] nor the [subcontractor] had any part in the design of the dolly"); *Bloemer v. Art Welding Co.,* 884 S.W.2d 55, 56 (Mo.App.) (defendants fabricated and installed the machine "precisely in accordance with the plans and specifications prepared" by the purchaser of the.machine), *reh'g denied, transfer denied* (1994); *Austin v. Clark Equip. Co.,* 48 F.3d 833, 837 (4th Cir.1995) (manufacturer not liable because purchaser of the equipment chose not to purchase optional safety devices, thus, manufacturer should not be liable for building products in accordance with the purchase order).

The defendants cite a few cases to support their contention that the contract specifications defense may apply even when the manufacturer consulted with the designer during the specification of the contract. The cases cited discuss a doctrine known as the government contract defense. *See Koutsoubos v. Boeing Vertol, Div. of Boeing Co.,* 755 F.2d 352 (3rd Cir.), *cert. denied,* 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985). Moreover,

one of the cases, *In re Estate of Foster,* 55 Wash.App. 545, 779 P.2d 272 (1989), *rev. denied,* 114 Wash.2d 1004, 788 P.2d 1079 (1990), relies on a Washington statute to establish the defense. The government contract defense, however, is based on several policy considerations that are absent when the government is not involved. These include that holding government contractors liable could subvert sovereign immunity when contractors pass the cost of accidents through to the government, and that liability of government contractors might "thrust the judiciary into the making of military decisions." *Koutsoubos,* 755 F.2d at 354 (internal quotation omitted). Thus, the cases discussing the involvement of the contractor in the design of the equipment do not apply when the contract is not for government equipment. Accordingly, because of the level of involvement of Toppan Moore and Inforite in the design of the DIAD, the court declines to apply the contract specifications defense.

### 5. *Punitive Damages*

The plaintiffs have agreed to dismiss any claim that they may have had for punitive damages against Toppan Moore and Inforite.

### 6. *Post–Manufacture Failure to Warn*

 Within their strict product liability claims, the plaintiffs allege that the defendants are liable because they failed to warn the plaintiffs of defects in the DIAD. Toppan Moore and Inforite contend that there is no evidence that they should have learned of possible dangers connected with the use of the DIADs until litigation began in *Neher* in November of 1994 and, thus, they cannot be held liable for failing to warn of dangers.

The plaintiffs point to the following evidence that the defendants should have known of the dangers connected with the use of the DIADs. The UPS drivers used the DIADs by holding the devices with both hands along the edges in pinch grips and pressing the keypads with their thumbs. The way the UPS drivers used the DIADs became known to UPSGSC and Shigeaki Sano of Toppan Moore during field tests of the devices in the State of New York in 1989. The plaintiffs' expert, Dr. David Rempel, testified that the

force required to depress the keys on the keypad of a DIAD is seven to ten times more than the force typically used on the keyboard of a conventional desktop computer. Dr. Rempel states that a substantial body of literature dating back to the 1950's shows that frequent and forceful pinch grips, particularly when coupled with awkward wrist postures, as required to hold the DIADs, are associated with upper extremity disorders which are caused by cumulative trauma. Much of this·literature was published in 1979 or later. Another expert for the plaintiffs, Dr. Robert Radwin, testified that by the mid–1980's, it was well accepted in the industry that the design of hand tools should include consideration of ergonomic knowledge and principles, namely the physical interaction between humans, tasks and tools. On September 19, 1986, Lafferty of UPSGSC sent a letter to Kato of Inforite advising Kato that the DIADs were unbalanced, and that the weight of a DIAD, then at 36 ounces, should be reduced if possible. As tested by Dr. Rempel, the DIAD IA weighed 1.7 kilograms, or approximately 59 ounces. Kato testified that, before the *Neher* case was filed, UPS drivers who came to his office in San Mateo, California said that the DIAD was a bit bulky and heavy. Kato took the comments as wishful thinking rather than serious complaints and did not pass these comments to Toppan Moore.

Plaintiff Phyllis White is from the State of Virginia; plaintiff Timothy Nichols is from the State of Kentucky.

A manufacturer or seller is only liable for failure to warn if it knew or should have known of the danger posed by the product. *Featherall v. Firestone Tire and Rubber Co.,* 219 Va. 949, 252 S.E.2d 358, 369 (1979) (Virginia law); *see Post v. American Cleaning Equip. Corp.,* 437 S.W.2d 516, 519–20 (Ky.Ct. App.1968) (Kentucky law).

The court concludes that the plaintiffs have raised a material issue of fact as to whether Toppan Moore and Inforite should have known of the alleged dangers of the DIAD prior to 1990. The motion of Toppan Moore and Inforite for summary judgment against this claim is denied.

### 7. Workers' Compensation Statutes

#### a. Joint Employer Doctrine

UPSGSC contends that the workers' compensation statutes of the home states of the plaintiffs bar its liability because UPSGSC is a joint employer with UPS, Inc.

Under the laws of the States of Kentucky and Virginia, the home states of Nichols and White, the workers' compensation acts limit an employee's recovery against his or her employer exclusively to the remedies in the acts. KRS § 243.690(1); VCA § 65.2–307.

A person may be jointly employed by more than one employer. In those cases, both employers receive the benefit of workers' compensation immunity for employers. The primary factor in analyzing an employment relationship is whether the putative employer has the right to control the means and methods to be used to accomplish the agreed upon result. *New Independent Tobacco Warehouse, No. 3, Inc. v. Latham,* 282 S.W.2d 846, 848 (Ky.1955); *Intermodal Servs., Inc. v. Smith,* 234 Va. 596, 364 S.E.2d 221, 224 (1988).

Under the Service Agreement at issue here, UPSGSC contracted with UPS America to provide administrative and management services for UPS, Inc., the employer of the plaintiffs. The administrative and management services that UPSGSC contracted to provide for UPS, Inc. include centralized administrative functions, such as purchasing insurance, accident· prevention, purchasing vehicles and other supplies, researching other equipment or techniques to improve efficiency and control of costs, and to investigate problems reported by the operating companies. The services do not include line management of employees, particularly the package car drivers. Although UPSGSC contends that it has the right to control the activities of the package car drivers through its regional managers, there is no evidence that this right has ever been exercised. Supervisors employed by UPS, Inc. direct the daily activities of the package car drivers. The undisputed evidence is that UPSGSC does not control the manner in which the work of the package car drivers is performed. Based on the Service Agreement,

the plaintiffs have raised an issue of material fact as to whether UPSGSC has the right to control the package car drivers or the right to discharge them.

Continuing to other factors, UPSGSC does not pay the plaintiffs. UPSGSC coordinates the purchase of the equipment used by the plaintiffs, including the DIADs involved in this case. UPSGSC does not retain ownership of the equipment used by the plaintiffs. It transfers ownership of the equipment used by the plaintiffs to UPS, Inc. Thus, UPSGSC acts more as a vendor than as a company which is loaning, or furnishing, the equipment to UPS, Inc.

The court concludes that there is a factual issue as to whether UPSGSC is a joint employer of White or Nichols. The motion of UPSGSC for summary judgment based on this argument is denied.

b. *"Strangers to the Business"*

■ Although an employee in the State of Virginia is barred from suing his or her employer, the employee may sue "any other party" who is responsible for the injury. VCA § 65.2–309(A). The courts have interpreted this phrase to mean that a valid defendant "had to be a stranger to the trade, occupation, or business in which the plaintiff was involved." *Whalen v. Dean Steel Erection Co., Inc.,* 229 Va. 164, 327 S.E.2d 102, 104 (1985), *appeal dismissed,* 474 U.S. 802, 106 S.Ct. 33, 88 L.Ed.2d 26 (1985). Put another way, "the test continues to be whether the act complained of relates to the business of the employer." *Rasnick v. Pittston Co., Inc.,* 237 Va. 658, 379 S.E.2d 353, 355 (1989). The relationship can be rather broad. In *Rasnick,* the defendants were subsidiary companies of the employer, a coal mining company. The defendants prepared mine ventilation plans, inspected the mines, and trained personnel. After an explosion in the mine, the subsidiaries were found not liable because they were not strangers to the business. *Id.* Liability has also been barred for subcontractors who furnished equipment and a crew to perform part of a construction project but not for subcontractors who merely delivered materials to the construction site. *Whalen,* 327 S.E.2d at 105.

Here, the act complained of is the design of the DIAD. The DIAD, used by all of the package car drivers, relates to the business of UPS, Inc., delivering packages. Both companies were involved in the design of the DIAD. The court concludes that UPSGSC and II Morrow are not strangers to the business and, accordingly are protected from liability. Although Toppan Moore and Inforite did not join this argument, the analysis applies equally well to them. Summary judgment is granted on White's claims against all defendants.

8. *Strict Product Liability and Stream of Commerce*

UPSGSC and II Morrow contend that strict product liability laws should not be applied to them because they have never put DIADs or DVAs into the stream of commerce and, thus, they are not sellers under the statute. The companies also contend that the State of Virginia, the home state of White, does not allow strict liability in tort claims.

■ The State of Virginia has not adopted the Restatement (Second) of Torts § 402A (1965). *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.,* 236 Va. 419, 374 S.E.2d 55, 57 n. 4 (1988). "[I]t is well established that warranty liability under Virginia law for personal injuries caused by defective products is the functional equivalent of strict tort under the *Restatement* formulation." *Bly v. Otis Elevator Co.,* 713 F.2d 1040, 1045 n. 6 (4th Cir.1983), *reh'g on other grounds sub nom. Farish v. Courion Indus.,* 754 F.2d 1111 (4th Cir.1985). White has styled her second claim as one in strict product liability in tort and not as a warranty claim. This is an alternative reason for dismissing White's second claim against all defendants.

■ The State of Kentucky has adopted the Restatement (Second) of Torts § 402A (1965), which states: "(1) One who sells any product in a defective condition unreasonably dangerous to the user ... is subject to liability ... if (a) the seller is engaged in the business of selling such a product...." *Niehoff v. Surgidev Corp.,* 950 S.W.2d 816, 822

(Ky.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1187, 140 L.Ed.2d 317 (1998). The term "sell" "is merely descriptive and a product is considered sold if it has been placed in the stream of commerce by any means." *Taylor v. General Motors, Inc.,* 537 F.Supp. 949, 952 (E.D.Ky.1982) (quotation omitted).

Many of the cases cited by the parties are either distinguishable factually, such as when a company designs equipment which injures its own employees, or have similar facts but analyze a different legal issue, such as the doctrine of joint employers or dual capacities. UPSGSC and UPS, Inc. are two separate corporate entities: UPS, as a generally known corporate identity, is in the business of delivering packages and not in the business of selling DIADs. The different corporations within the corporate structure have distinct functions. UPS, Inc., which employs the package car drivers, is in the business of delivering packages. UPSGSC does not deliver packages; it is in the business of providing administrative functions, including equipment such as the DIADs. II Morrow has the single administrative function of providing such equipment. Although UPSGSC is not organized as a profit center, there is an inference that DIADs are transferred from UPSGSC to UPS, Inc. These facts are sufficient for this court to find that there is a factual issue on whether UPSGSC and II Morrow put the DIADs into the stream of commerce, and they may be strictly liable under product liability laws. As a consequence, the court denies summary judgment on this basis.

9. *Negligence*

■ II Morrow contends that it cannot be found negligent because it provided limited consulting and assembly services concerning the DIADs and the DVAs and, thus, does not owe a duty to the plaintiffs. The plaintiffs contend that II Morrow designed and manufactured the DIAD IA–1 and consequently was sufficiently involved to owe a duty to the plaintiffs.

The record before the court shows that II Morrow was involved, at least to some extent, with the design and manufacture of some of the DIAD models. The court cannot determine on the record before it whether II Morrow's involvement was so limited that it would not give rise to a duty owed to the plaintiffs. Accordingly, the motion for summary judgment against the negligence claim alleged against II Morrow is denied.

10. *Virginia Statute of Limitations*

All defendants contend that White's claims are barred by the statute of limitations in the State of Virginia, her home state. White contends that the statute of limitations was tolled during the pendency of an action she filed in New York and that she had additional injuries occurring during the two-year limitations period.

In Virginia, an action for personal injuries must be brought within two years after the cause of action accrues. VCA § 8.01–243. "[T]he right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained...." VCA § 8.01–230. "Injury" is construed as a positive, physical or mental hurt and not necessarily a legal wrong in the sense that a legally protected interest was invaded. *Locke v. Johns–Manville Corp.,* 221 Va. 951, 275 S.E.2d 900, 904 (1981). It is possible for an injury to occur long before symptoms are noticed. *Id.* 275 S.E.2d at 905. Moreover, the injury may be slight; it is immaterial if more substantial damage occurs later. *McHenry v. Adams,* 248 Va. 238, 448 S.E.2d 390, 393 (1994).

White first noticed numbness in her arms on December 10, 1992. The numbness caused White to see a doctor on January 20, 1993. White states that she had carpal tunnel surgery in July and September of 1993 which provided her with immediate relief from pain in one wrist and dramatic improvement in the other. White returned to work in the fall of 1993. She began having pain again in June of 1994. Sometime in 1995, White went back to the doctor because of severe pain in her elbows. The condition was diagnosed as medial epicondylitis. White filed a similar action in the State of New York on March 27, 1995. The New York action was dismissed on forum non conveniens grounds on April 19, 1996. White filed this action on August 2, 1996.

White contends that the statute of limitations was tolled for 389 days during the pendency of the New York action and that she suffered a separate injury, the medial epicondylytis in her elbow, during the limitations period.

White's original injury occurred at some point before December 10, 1992, when she first felt symptoms. If the medial epicondylytis in White's elbow is a different symptom of the same injury, which also manifested itself in 1993 as tendinitis and carpal tunnel syndrome, the New York action was filed after the statute of limitations had run. If this is the case, the tolling statute is irrelevant.

Neither party has provided the court with expert medical opinions on whether White has a single injury or two injuries, one in her wrists and one in her elbows. Likewise, there are no expert medical opinions on when the injury or injuries were sustained. Consequently, the court cannot make the determination. Summary judgment on this basis is denied.

## CONCLUSION

The motion of defendant Inforite for summary judgment (# 54) is granted in part and denied in part. The motion of defendant Toppan Moore to join defendant Inforite's motion for summary judgment (# 58) is denied.

The motion of defendant Toppan Moore for summary judgment (# 53) is granted in part and denied in part.

The motion of defendants UPSGSC and II Morrow for summary judgment (# 55) is granted in part and denied in part.

In summary, the claims for punitive damages against defendants Toppan Moore and Inforite are dismissed. Plaintiff Phyllis White's claims against all defendants are dismissed.